**PIONEER HI–BRED INTERNATIONAL, INC., Plaintiff,**

v.

**OTTAWA PLANT FOOD, INC., Defendant.**

No. C 98–4016–MWB.

United States District Court, N.D. Iowa, Western Division.

Sept. 29, 2003.

ty, R. Scott Johnson, McKee, Voorhees & Sease, PLC, Daniel J. Cosgrove, Pioneer Hi-Bred International, Des Moines, IA, for Plaintiff/counter–defendant.

James W. Redmond, John C. Gray, Heidman, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl, Sioux City, IA, Keith D. Parr, Lord, Bissell & Brook, Mark R. Sargis, Bellande, Cheely, O'Flaherty, Sargis & Ayres, Chicago, IL, for Defendants.

MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT AND THE DEFENDANT'S MOTION TO STRIKE AFFIDAVIT

Christine Lebron–Dykeman, Edmund J. Sease, Heidi Sease Nebel, Jeffrey D. Har-

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. **INTRODUCTION** ...................................................... 1022
 A. *Procedural Background* ............................................ 1022
 B. *Factual Background* ............................................... 1023

II. *OTTAWA'S MOTION TO STRIKE AFFIDAVIT* ............................ 1026

III. *STANDARDS FOR SUMMARY JUDGMENT* ............................... 1029

IV. *LEGAL ANALYSIS OF SUMMARY JUDGMENT MOTIONS* .................. 1031
 A. *Issues Presented* ................................................ 1031
 B. *Liability Issues* ................................................. 1031
 1. *"First sale" or "patent exhaustion"* ........................... 1031
 a. *Arguments of the parties* .................................. 1031
 b. *Applicable law* ........................................... 1032
 c. *Analysis* ................................................ 1033
 2. *Restrictions in the "limited label license"* .................... 1035
 a. *Arguments of the parties* .................................. 1035
 b. *Applicable law* ........................................... 1036
 c. *Analysis* ................................................ 1038
 i. *Interpretation of the restrictive language* ................ 1038
 ii. *Presence of the restriction on bags purchased by Ottawa* .... 1040
 iii. *Ottawa's notice* ....................................... 1040
 3. *Enforceability of the label restrictions* ....................... 1042
 a. *Arguments of the parties* .................................. 1042
 b. *Applicable law and analysis* ................................ 1043
 i. *Permissible restrictions* ................................ 1043
 ii. *Scope of the patent rights and anticompetitive effects* ....... 1044
 iii. *Contract principles* .................................... 1046
 C. *Damages Issues* ................................................. 1049

1. *Marking or notice of patent rights* ................................. 1049
 a. *Arguments of the parties* ..................................... 1049
 b. *Applicable law* ............................................. 1050
 c. *Analysis* .................................................. 1051
 i. *Notice by "marking."* ................................... 1051
 ii. *Actual notice* ......................................... 1051
2. *Damages for infringement* ........................................ 1052
 a. *Arguments of the parties* ................................... 1052
 b. *Applicable law* ............................................. 1052
 c. *Analysis* .................................................. 1053
3. *Full compensation from prior sale* ................................ 1053
 a. *Arguments of the parties* ................................... 1053
 b. *Applicable law* ............................................. 1054
 c. *Analysis* .................................................. 1054
4. *Increased damages for "willful" infringement* ..................... 1054
 a. *Arguments of the parties* ................................... 1055
 b. *Applicable law* ............................................. 1056
 c. *Analysis* .................................................. 1056

*V. CONCLUSION* ................................................. 1057

This action, which involves a claim of alleged infringement of patents for hybrid and inbred seed corn by an unlicensed reseller, comes before the court pursuant to the parties' cross-motions for summary judgment or partial summary judgment (docket nos. 174 & 175). Also before the court is the defendant's motion to strike certain paragraphs of an affidavit offered by the plaintiff as part of the summary judgment record (docket no. 187). The court heard oral arguments on the motions on September 18, 2003. At those oral arguments, plaintiff Pioneer Hi–Bred International was represented by Edmund J. Sease, Christine Lebrón–Dykeman, and R. Scott Johnson of McKee, Voorhees & Sease, P.L.C., in Des Moines, Iowa, and Daniel J. Cosgrove of Pioneer, also in Des Moines, Iowa. Defendant Ottawa Plant Food, Inc., was represented by Keith D. Parr of Lord, Bissell & Brook in Chicago, Illinois, Mark R. Sargis of Bellande, Cheely, O'Flaherty, Sargis & Ayres in Chicago, Illinois, and James W. Redmond of Heid-man, Redmond, Fredregill, Patterson, Plaza, Dykstra & Prahl in Sioux City, Iowa. The motions are now fully submitted and some expedition in the disposition of the motions is required, as this matter is set for trial to begin on November 3, 2003.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Pioneer Hi–Bred International, Inc., commenced this patent infringement action[1] on February 20, 1998, against eight defendants not including the present defendant, Ottawa Plant Food, Inc., alleging that each of the defendants, none of whom were authorized Pioneer Sales Representatives, had illegally sold or offered for sale Pioneer ® brand seed corn. *See* Complaint. Ottawa was added as a defendant when Pioneer filed an Amended Complaint on September 11, 1998 (docket no. 80), apparently after Pioneer learned, through discovery, that Ottawa had acquired Pioneer ® brand seed corn from one

---

1. In this action, the United States Supreme Court has determined, *inter alia*, that the plaintiff's newly developed plants are patentable subject matter. *See J.E.M. AG Supply, Inc. d/b/a Farm Advantage, Inc. v. Pioneer Hi–Bred International, Inc.*, 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001), *reh'g denied*, 535 U.S. 1013, 122 S.Ct. 1600, 152 L.Ed.2d 515 (2002).

of the original defendants, Farm Advantage, Inc. The claims against all other defendants have since been settled, so that this litigation is continuing only between Pioneer and Ottawa. Pioneer's specific claim against Ottawa, pursuant to 35 U.S.C. § 271, is that Ottawa is not an authorized Pioneer Sales Representative, but that it has nevertheless, for some time past, and still is, infringing one or more of numerous patents-in-suit for Pioneer® brand hybrid and inbred seed corn by making, using, selling, or offering for sale Pioneer® brand seed corn, and will continue to do so unless enjoined by the court. *See* Amended Complaint, ¶ 16. Pioneer seeks injunctive relief, an accounting for damages, including damages for willful infringement, and assessments for interest and costs. *Id.* at Prayer. Ottawa answered the Amended Complaint on November 3, 1998 (docket no. 104), denying Pioneer's claim and asserting affirmative defenses of patent exhaustion, laches, waiver, and estoppel.[2]

Presently before the court are the parties' cross-motions for summary judgment or partial summary judgment filed July 22, 2003. More specifically, on July 22, 2003, Ottawa filed its Motions For Summary Judgment Of Noninfringement And No Damages (docket no. 174) on seven specific issues relating to liability and damages, which would be fully dispositive of this case if granted.[3] Also on July 22, 2003, Pioneer filed its Motion For Partial Summary Judgment Re: Infringement And Enforceability Of Pioneer's Limited Label License And Re: Ottawa's Affirmative Defense Under The Doctrine Of Patent Exhaustion (docket no. 175), which would be dispositive of liability issues, if granted,

but leave damages issues for trial. Pioneer resisted Ottawa's motion for summary judgment on August 15, 2003 (docket no. 192), and Ottawa filed a reply on August 27, 2003 (docket no. 204). Ottawa resisted Pioneer's motion for partial summary judgment on August 12, 2003 (docket no. 190), and Pioneer filed a reply in further support of its motion on August 26, 2003 (docket no. 201). In addition to these dispositive motions, the matters now before the court include Ottawa's August 12, 2003, Motion To Strike Certain Paragraphs Of Bruce Hall's Affidavit, which is offered by Pioneer as part of the summary judgment record (docket no. 187). Pioneer resisted the motion to strike on August 29, 2003 (docket no. 205), and Ottawa filed a reply on September 8, 2003 (docket no. 207).

### B. Factual Background

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial. *See, e.g., Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996). Nevertheless, the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient factual background to put in context the parties' arguments for and against the motions for summary judgment on Pioneer's patent infringement claim. More attention will be given to specific factual disputes, where necessary, in the court's legal analysis, below.

Plaintiff Pioneer, an Iowa corporation with its principal place of business in Des Moines, Iowa, is the world's largest producer of seed corn. Pioneer has developed

---

**2.** With the exception of patent exhaustion, Ottawa's affirmative defenses are not at issue in either party's cross-motion for summary judgment or partial summary judgment.

**3.** Ottawa's motion for summary judgment does not involve any challenge to the validity of the patents-in-suit.

and sells a wide range of hybrid and inbred seed corn varieties subject to one or more of the numerous patents-in-suit. Pioneer sells its seed through a "dual" distribution system, using licensed sales representatives—who never take title to the seed, and are licensed to sell it only to actual end users, *i.e.*, farmers, who plant the seed—and licensed dealers—who do take title to the seed, and are licensed to resell it only to other authorized dealers or end users. Defendant Ottawa, an Illinois corporation with its principal place of business in Ottawa, Illinois, is a seller and wholesaler of agricultural products, including seed corn. However, Ottawa is not now, and has never been, a licensed dealer or sales representative for Pioneer.

The parties agree that, from 1992 until 1998, Ottawa purchased and resold a number of bags of different varieties of Pioneer ® brand seed corn. Pioneer alleges that, during the time period in question, Ottawa sold 4,061 bags of Pioneer ® brand seed corn for a total of $315,110. The parties agree that Ottawa bought Pioneer ® brand seed corn from several different Pioneer Sales Representatives and licensed dealers and that Ottawa only bought Pioneer ® brand seed corn in its original packaging, as sold by Pioneer. Ottawa never altered the Pioneer seed bags or their contents, removed any bag tags, or repackaged the seed. Rather, Ottawa resold the seed to farmers and other dealers, including some Pioneer dealers or representatives who were having trouble obtaining a supply of certain Pioneer ® brand seed corn varieties. What the parties dispute is whether or not Ottawa's "resale" of Pioneer ® brand seed corn infringed Pioneer's patent rights in that seed corn.

Pioneer contends that, from at least 1986 onward, all of its seed corn was sold subject to a "limited label license," which appeared on each bag and/or bag tag of Pioneer ® brand seed corn. That "limited label license" prohibited any purchaser from using the seed corn for any purpose other than production of forage or grain for feeding or processing. Thus, Pioneer contends that no purchaser was licensed to resell the seed corn unless granted a separate license to do so by Pioneer. The parties agree that, before or during the period of Ottawa's alleged wrongdoing, Pioneer had turned down .Ottawa's request for a license to resell Pioneer ® brand seed corn as a dealer or sales representative.

Although Pioneer admits that the language on the bag labels and bag tags changed somewhat over time, it contends that the essence of the limited license granted to buyers did not. Somewhat more specifically, Pioneer contends that, beginning in sales year 1986 and continuing through sales year 1995, the language on the label on the seed bags read, in pertinent part, as follows:

THE FOLLOWING PROVISIONS ARE PART OF THE TERMS OF SALE OF THIS PRODUCT

One or more of the parental lines used in producing this hybrid are the exclusive property of Pioneer Hi–Bred International, Inc. Buyer intends to purchase and seller intends to sell only hybrid seed. *Buyer agrees that purchase of this bag of seed does not give any rights to use any such parental line seed* which may be found herein, or any plant, pollen or seed produced from such parental line seed, for breeding, research or seed production purposes or *for any purpose other than production of forage or grain for feeding or processing.*

\*　　\*　　\*　　\*　　\*　　\*

By acceptance of the seed or other products the Buyer acknowledges that the foregoing terms are conditions of the sale and constitute the entire agreement

between the parties regarding warranty or other liabilities and the remedy therefor.

Hall Affidavit, ¶ 16, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 3 (emphasis added). In 1995, a new version of the terms of the label license was developed and that language was used for sales years 1996 through 1998. The new version, in pertinent part, stated the following:

THE FOLLOWING PROVISIONS ARE PART OF THE TERMS OF SALE OF THIS PRODUCT

One or more of the parental lines used in producing this product are proprietary to Pioneer Hi–Bred International, Inc. ("Pioneer"). Parental lines are U.S. Protected Varieties and may be protected under the laws of other countries; export or transfer of possession is prohibited. Pioneer intends to supply only hybrid seed. *Customer agrees that it is not acquiring the rights to use any parental line for any purpose other than production of forage or grain for feeding or processing. If the tag indicated this product is produced under one or more U.S. patents, customer is licensed thereunder only to produce forage or grain for feeding or processing.* All uses outside the U.S. are prohibited to the extent they result in infringement of U.S. patents. For availability of other licenses, contact Pioneer.

\* \* \* \* \* \*

By acceptance of the seed or other products the Buyer acknowledges that the foregoing terms are conditions of the sale and constitute the entire agreement between the parties regarding warranty or other liabilities and the remedy therefor.

Hall Affidavit, ¶ 17, Plaintiff's Appendix In Support Of Its Motion For Partial Sum-

mary Judgment at 3–4 (emphasis added). For the 1999 sales season, the bag language for the first time included a specific prohibition on "resale" of the seed, but the parties agree that Ottawa ceased selling Pioneer ® brand seed corn in 1998 after the initiation of this lawsuit against Ottawa by Pioneer.

Pioneer also contends that, beginning in the 1996 sales season, it also included the U.S. patent numbers applicable to the seed in each bag on the corresponding bag tags of the hybrid seed corn sold commercially in order to comply with the patent marking statute, 35 U.S.C. § 287 (2003). Also in 1996, Pioneer contends that it amended the bag tag to include limited license language, as follows: "This product is for license only. PIONEER ® brand products are sold subject to the terms and conditions of sale which are part of the labeling and sale documents." Hall Affidavit, ¶ 21, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 5. After identifying the patent numbers, the bag tag continued, as follows: "License is granted solely to produce grain and/or forage. For other licenses, contact Pioneer Hi–Bred International, Inc.... PIONEER ® brand products are sold subject to the terms and conditions of sale which are part of the labeling and sale documents." *Id.* at ¶ 22, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 5.

Ottawa contends that the "limited label licenses" used before the 1999 sales season restricted the "use" of the products, but did not restrict the "resale" of the products, which is a legal question, which will be addressed below. As to factual contentions, however, Ottawa also contends that Pioneer has failed to produce any evidence of what "limited label license" or bag tag appeared on any Pioneer ® brand seed corn sold by Ottawa. Ottawa asserts that

no such language appeared on some of the bag tags that it has retained. Ottawa also contends that, even if the "limited label license" language appeared on bags of Pioneer® brand seed corn that Ottawa acquired and resold, Ottawa's employees did not read and had no reason to read the labels, beyond verification of the type, size, and maturity of the seed. The parties do agree that Ottawa does not produce grain or forage, but instead resold all of the Pioneer® brand seed corn that it acquired, either to other dealers or to corn producers.

In May 1994, Pioneer sent Ottawa a letter notifying Ottawa that it had come to Pioneer's attention that Ottawa was reselling Pioneer® brand seed corn; asserting that Ottawa could only have obtained that seed corn from Pioneer Sales Representatives; advising Ottawa that sales of Pioneer® brand seed corn by Pioneer's Sales Representatives to anyone other than farmers were prohibited by the Sales Representatives' contracts; and advising Ottawa that Ottawa's purchase of seed corn from Pioneer Sales Representatives might have caused the Sales Representatives to breach their contracts with Pioneer, opening Ottawa up to liability for tortious interference with the contractual relations between Pioneer and its Sales Representatives. Pioneer contends that this letter placed Ottawa on notice that its acquisition and resale of Pioneer® brand seed corn was in derogation of Pioneer's patent rights. Ottawa contends that this letter provided no such notice, but instead appeared to be a complaint about the conduct of Pioneer's own sales force. Upon receiving the May 1994 letter, however, Ottawa contends that it contacted the Federal Trade Commission and the Illinois Attorney General's Office, and was advised by both bodies that Ottawa was not violating any laws by reselling Pioneer seed. However, Ottawa did not receive a written opinion from either body on the matter. Ottawa contends that it received no notice that Pioneer was asserting "patent infringement" until this lawsuit was filed against it, at which time Ottawa ceased acquiring or reselling Pioneer® brand seed corn. However, Pioneer points to testimony of Ottawa's former controller, Lester Borden, to the effect that Ottawa's managers and sales representatives simply did not care whether or not Pioneer objected to Ottawa's acquisition or resale of Pioneer® brand seed corn.

## II. OTTAWA'S MOTION TO STRIKE AFFIDAVIT

In addition to the dispositive motions now before the court, the court must also consider Ottawa's motion to strike certain paragraphs of the affidavit of Bruce Hall, which Pioneer has offered as part of the summary judgment record. Specifically, Ottawa challenges paragraphs 9, 10, 12, 16, 17, 18, 19, 20, 21, and 22 of Mr. Hall's affidavit on the grounds that these paragraphs are not based on Mr. Hall's personal knowledge and/or are different from or contradictory to his sworn deposition testimony.[4] Pioneer's general response is that each of the challenged paragraphs is, indeed, supported by Mr. Hall's testimony, together with documentary evidence, and at most, his affidavit clarifies his prior deposition testimony.

As this court recently explained,

---

**4.** Ottawa appears to complain that Pioneer has not responded fully to Ottawa's request for documents upon which Mr. Hall relied, either in his deposition or affidavit. However, the court does not read Ottawa's motion to strike as requesting sanctions for failure to make discovery pursuant to Rule 37(c)(1). *See generally Cooperative Fin. Ass'n, Inc. v. Garst,* 917 F.Supp. 1356, 1373–74 (N.D.Iowa 1996).

Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). Because affidavits proffered in support of a motion for summary judgment must be based upon personal knowledge, an affidavit based upon "information and belief" is insufficient as a matter of law. *Automatic Radio Mfg. Co. v. Hazeltine Research,* 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)); *accord Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639 (2d Cir.1988); *Tavery v. United States,* 32 F.3d 1423, 1426 n. 4 (10th Cir.1994). Furthermore, the court may consider only that evidence that would be admissible at trial. *Samuels v. Doctors Hosp., Inc.,* 588 F.2d 485, 486 n. 2 (5th Cir.1979). Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based upon personal knowledge, may be stricken. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (lack of personal knowledge); *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (conclusory allegations and legal arguments).

With respect to [the requirements of Rule 56(e),] [c]ourts have recognized that "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir.2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir.

1998)); *accord Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *see Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998); *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993).

*Wells Dairy, Inc. v. Travelers Indemnity Co. of Illinois,* 241 F.Supp.2d 945, 956–57 (N.D.Iowa 2003); *see also Helm Fin. Corp. v. Iowa Northern Ry. Co.,* 214 F.Supp.2d 934, 952–54 (N.D.Iowa 2002) (stating similar standards).

This court has also considered the standards applicable to alleged contradiction of prior deposition testimony by an affidavit offered in resistance to summary judgment:

As to contradiction of prior testimony, the Eighth Circuit Court of Appeals recently reiterated the following principles:

It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997). Consequently,

a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would

ever be appropriate for summary judgment.

*Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988) (internal citations and quotation marks omitted).

*Bass v. City of Sioux Falls,* 232 F.3d 615, 619 (8th Cir.1999); *accord Dotson v. Delta Consolidated Indus., Inc.,* 251 F.3d 780, 781 (8th Cir.2001) ("We have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition. *See, e.g., American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997), and *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364–65 (8th Cir.1983)."); *Plymouth Foam Prods., Inc. v. City of Becker,* 120 F.3d 153, 155 n. 3 (8th Cir. 1997) (to the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded); *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 402 (8th Cir.1995) (same). The Eighth Circuit Court of Appeals has explained that the rule that a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony "is a sound one," because "if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir.2000) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1366 (8th Cir.1983)).

However, the Eighth Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass,* 232 F.3d at 619. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring,* 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.,* 719 F.2d at 1364–65). In such circumstances, "it would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

*Helm Fin. Corp.,* 214 F.Supp.2d at 954–55.

The court could, perhaps, engage in a paragraph-by-paragraph analysis of whether each of the challenged paragraphs of Mr. Hall's affidavit meets or fails to meet the standards of Rule 56(e) or is contradictory to his deposition testimony. However, as a general matter, the court finds that any differences between Mr. Hall's deposition testimony and his affidavit appear to be primarily clarifications and amplifications in his affidavit of issues addressed in his deposition or matters on which he professed lack of knowledge or memory *at the time of his deposition.* Thus, the subsequent affidavit does not offend the standards cited above. *See Helm Fin. Corp.,* 214 F.Supp.2d at 955. Moreover, the court finds that this is a situation where any ambiguities or even conflicts between Mr. Hall's deposition testimony and the challenged paragraphs of his affidavit should be left to the jury to sort out, if indeed a jury question is otherwise presented. *Id.*

More importantly, the court finds it unnecessary to consider separately whether each of the challenged paragraphs of Mr.

Hall's affidavit satisfies the applicable standards until and unless it is clear that whether or not there is a genuine issue of material fact on a pertinent issue hangs on his affidavit. The court's disposition of the parties' cross-motions for summary judgment or partial summary judgment will necessarily moot Ottawa's motion to strike. This is so, because either (1) the court's analysis of the motion for summary judgment will necessarily determine whether any portions of Mr. Hall's affidavit generate genuine issues of material fact *on issues pertinent to the summary judgment motions,* based on the requirements of Rule 56(e) and applicable case law, or (2) the summary judgment motions will be resolved without consideration of challenged portions of Mr. Hall's affidavit, such that portions of the motion to strike will be mooted *sub silentio.* Therefore, the court will deny Ottawa's motion to strike in its entirety as mooted by the court's disposition of the cross-motions for summary judgment, below.

## III. STANDARDS FOR SUMMARY JUDGMENT

The Federal Circuit Court of Appeals has explained its exclusive jurisdiction over certain appeals, as follows:

> Our relevant jurisdictional authority is contained in 28 U.S.C. § 1295(a)(1) (1994), which states that this court enjoys exclusive appellate jurisdiction over appeals "based, in whole or in part, on section 1338 [of Title 28]." Section 1338(a), in turn, provides that district courts have jurisdiction over suits "arising under any Act of Congress relating to patents." 28 U.S.C. § 1338(a) (1994). Thus, our jurisdiction turns upon whether the claims here arise (at least in part) under the patent laws.

 \* \* \* \* \* \*

> ... "In order to demonstrate that a case is one 'arising under' federal patent law, 'the plaintiff must set up some right, title or interest under the patent laws, or at least make it appear that some right or privilege will be defeated by one construction, or sustained by the opposite construction of these laws.' " *Christianson [v. Colt Industries Operating Corp.],* 486 U.S. [800,] 807–08, 108 S.Ct. 2166, [100 L.Ed.2d 811 (1988)] (quoting *Pratt v. Paris Gaslight & Coke Co.,* 168 U.S. 255, 259, 18 S.Ct. 62, 42 L.Ed. 458 (1897)). In other words, the scope of section 1338 extends to (1) claims where federal patent law creates the cause of action, or (2) claims where the plaintiff's right to relief necessarily depends upon resolution of a "substantial question of federal patent law." *Christianson,* 486 U.S. at 809, 108 S.Ct. 2166, 100 L.Ed.2d 811.

*Helfgott & Karas, P.C. v. Dickenson,* 209 F.3d 1328, 1333–34 (Fed.Cir.2000). This lawsuit involves claims of patent infringement that involve causes of action created by federal patent law. Moreover, the present cross-motions for summary judgment necessarily involve "substantial question[s] of federal patent law," such as Ottawa's defense of "patent exhaustion," and the availability of damages for patent infringement under certain provisions of the Patent Act. *See id.* Thus, this action and the present cross-motions for summary judgment fall within the exclusive jurisdiction of the Federal Circuit Court of Appeals. Therefore, the court will consider here the standards for summary judgment in patent cases, as articulated by the Federal Circuit Court of Appeals.

Rule 56 of the Federal Rules of Civil Procedure, which governs motions for summary judgment, states, in pertinent part, the following:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b)-(c) (emphasis added). As the plain language of the rule indicates, the appropriateness of summary judgment ordinarily turns on whether or not there are genuine issues of material fact that must be resolved by the trier of fact. On the other hand, questions of law are particularly amenable to summary judgment precisely because they do not turn on factual disputes. *See, e.g., Varilease Technology Group, Inc. v. U.S.,* 289 F.3d 795, 798 (Fed.Cir.2002) (contract interpretation, as a question of law, is amenable to summary judgment); *Gentex Corp. v. Donnelly Corp.,* 69 F.3d 527, 530 (Fed.Cir.1995) (patent claim interpretation, as a question of law, is amenable to summary judgment). The Federal Circuit Court of Appeals has recognized the general proposition that "[s]ummary judgment is appropriate in a patent case, as in other cases." *Nike, Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 646 (Fed.Cir.1994); *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir. 1994) ("The grant of summary judgment [in a patent case] is appropriate where the standards set forth in Rule 56(c) are satisfied.").

Taking a closer look at the meaning of the standards for summary judgment pursuant to Rule 56, "[a] genuine issue exists if the evidence is such that a reasonable jury could find for the nonmoving party." *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 962 (Fed.Cir.2001) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002). "A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceedings." *Id.* (again citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). "While the burden rests on the party moving for summary judgment to show 'that there is an absence of evidence to support the non-moving party's case,' the nonmoving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Id.* at 971 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The court will apply these standards to the parties' cross-motions for summary judgment or partial summary judgment in this patent infringement action.

## IV. LEGAL ANALYSIS OF SUMMARY JUDGMENT MOTIONS

### A. Issues Presented

Ottawa's motion for summary judgment involves seven issues pertaining to liability and damages, while Pioneer's motion for partial summary judgment is essentially the "mirror image" of Ottawa's as to the first three issues. The cross-motions, therefore, present the following issues: (1) whether Ottawa's purchase and resale of Pioneer ® brand seed corn is immunized from liability for patent infringement under the "first sale" or "patent exhaustion" doctrine; (2) whether Ottawa had notice of and was bound by Pioneer's restrictions in its "limited label license"; (3) whether Pioneer's "limited label license" restrictions are enforceable or are instead unenforceable as against public policy owing to their anticompetitive effect or unenforceable under applicable contract principles; (4) whether Pioneer has any evidence of notice to Ottawa of the patents-in-suit and alleged infringement supporting Pioneer's claim for compensatory damages under 35 U.S.C. § 287; (5) whether Pioneer has any evidence that any of the seed tags or seed bags purchased and resold by Ottawa contained any language prohibiting resale supporting Pioneer's claim for damages under 35 U.S.C. § 284; (6) whether Pioneer has already recovered its full profits in connection with the first sale of any seed, so that it is not entitled to any compensatory damages; and (7) whether Pioneer has any evidence supporting its claim for increased damages based on "willful" infringement. Issues (1) through (3)—the issues on which there are cross-motions for summary judgment—thus go to "liability," while issues (4) through (7)—which are the subject only of Ottawa's motion for summary judgment—go to "damages" or the prerequisites for any damages. The court will consider these issues in turn, subdividing its discussion into "liability" issues, on which, coincidentally, there are cross-motions for summary judgment, and "damages" issues, which are raised only in Ottawa's motion for summary judgment.

### B. Liability Issues

#### 1. "First sale" or "patent exhaustion"

In its motion for summary judgment, Ottawa contends, first, that Pioneer's patent infringement claims are barred by the "first sale" or "patent exhaustion" doctrine. However, in its motion for summary judgment, Pioneer contends that it, not Ottawa, is entitled to summary judgment on Ottawa's "patent exhaustion" defense.

#### a. Arguments of the parties

In its own motion for summary judgment, Ottawa argues that, while the patent laws grant a patent holder the exclusive right to make, use, and sell a patented invention, once the patentee sells the patented item, he effectively surrenders or "exhausts" this monopoly and forfeits the ability to control use of the invention by the buyer. In this case, Ottawa contends that Pioneer's patent rights were "exhausted" by a "first sale" when Pioneer or a Pioneer dealer first sold the seed corn that Ottawa bought. Ottawa contends, further, that it is presumed that, in pricing for the "first sale," Pioneer was fully compensated for the value of its invention and can no longer assert any control over the patented product or obtain any "damages" for its resale. More importantly, Ottawa argues that the "first sale" immunizes Ottawa's subsequent resale from any claim of patent infringement.

In response to Ottawa's motion for summary judgment and in support of its own

motion for summary judgment on Ottawa's "patent exhaustion" defense, Pioneer contends that Ottawa cannot establish the prerequisite for application of the "first sale" or "patent exhaustion" rule, which is an *unconditional* sale of the patented product. Here, Pioneer contends that any prior sale of the seed corn at issue before Ottawa's resale was specifically conditioned by the terms of the "limited label license," which grants only a right to use the seed corn to produce grain or forage. Pioneer also contends that distribution of Pioneer ® brand seed corn to Pioneer authorized Sales Representatives or dealers does not constitute an unconditional "first sale." Rather, Pioneer argues that such sales were conditioned by the terms of the representatives' or dealers' limited licenses to resell the patented products, which prohibited sales representatives from selling to individuals or groups for resale, and permitted dealers to resell only to other licensed dealers or persons who would use the seed to produce grain or forage. Pioneer argues, further, that any price it received for transfers of the seed corn prior to the resale by Ottawa reflected only the value of the limited license to use the seed corn to produce grain or forage, not the full value of the patented invention or the retained patent rights. Pioneer points out that Ottawa admits that it was never granted a license to resell Pioneer ® brand seed corn, so that Ottawa never acquired that "stick" from Pioneer's "bundle" of patent rights.

In its reply in further support of its own motion for summary judgment, Ottawa contends that Pioneer's "limited label license" simply does not restrict or prohibit Ottawa's right to "resell" Pioneer ® brand seed corn. Ottawa argues that the "limited label license" restricts only certain "uses," but is silent as to "resale," so that the "first sale" exhausted any patent rights with regard to "resale." Ottawa did not, however, directly address that part of Pioneer's motion for partial summary judgment seeking summary judgment on Ottawa's "patent exhaustion" defense in its resistance to Pioneer's motion for partial summary judgment.

### b. *Applicable law*

As the Federal Circuit Court of Appeals recently reiterated, "when a patented product has been sold the purchaser acquires 'the right to use and sell it, and ... the authorized sale of an article which is capable of use only in practicing the patent is a relinquishment of the patent monopoly with respect to the article sold.' " *Monsanto Co. v. McFarling*, 302 F.3d 1291, 1298 (Fed.Cir.2002) (quoting *United States v. Univis Lens Co.*, 316 U.S. 241, 249, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942)). It is not *any* sale that invokes this "first sale" or "patent exhaustion" rule, however. Rather,

> The *unrestricted* sale of a patented article, by or with the authority of the patentee, "exhausts" the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold. In *United States v. Masonite Corp.*, 316 U.S. 265, 278, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), the Court explained that *exhaustion of the patent right depends on "whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article."* See, e.g., *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568, 27 USPQ2d 1136, 1138 (Fed. Cir.1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent.") Thus when a patented device has been lawfully sold in the United States, subsequent purchasers

inherit the same immunity under the doctrine of patent exhaustion.

*Jazz Photo Corp. v. International Trade Comm'n*, 264 F.3d 1094, 1105 (Fed.Cir. 2001) (emphasis added), *cert. denied*, 536 U.S. 950, 122 S.Ct. 2644, 153 L.Ed.2d 823 (2002); *accord Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1349 (Fed.Cir.2003) ("The exhaustion doctrine is based upon the proposition that '[t]he unrestricted sale of a patented article, by or with the authority of the patentee, "exhausts" the patentee's right to control further sale and use of that article by enforcing the patent under which it was first sold.' *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1105, 59 USPQ2d 1907, 1914 (Fed. Cir.2001)."). In *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed.Cir. 1992), the Federal Circuit Court of Appeals noted that the Supreme Court had "considered and affirmed the basic principles that *unconditional* sale of a patented device exhausts the patentee's right to control the purchaser's use of the device," but that "the sale of patented goods, like other goods, can be conditioned." *Mallinckrodt, Inc.*, 976 F.2d at 706 (emphasis added). Furthermore, the court explained that "[t]he principle of exhaustion of the patent right d[oes] not turn a conditional sale into an unconditional one." *Id.; accord B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed.Cir.1997) (noting that, in *Mallinckrodt*, the court "canvassed precedent concerning the legality of restrictions placed upon the post-sale use of patented goods" and concluded that, as a general matter, "an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter"). Thus, where something less than all of the rights in the patent have been "sold" to a buyer, "[t]he price paid by the purchaser 'reflects only the value of the "use" rights conferred by the patentee.'" *Monsanto Co.*, 302 F.3d

at 1299 (quoting *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed.Cir. 1997)), and the "first sale" or "patent exhaustion" rule does not apply. *Id.; B. Braun Med., Inc.*, 124 F.3d at 1426 ("This exhaustion doctrine, however, does not apply to an expressly conditional sale or license.").

#### c. *Analysis*

■ The court concludes that it is Pioneer, not Ottawa, that is entitled to summary judgment on Ottawa's "patent exhaustion" defense. Ottawa has failed to generate a genuine issue of material fact that the sale of Pioneer ® brand seed corn was *not always* conditional, so that, in the face of undisputed evidence that the sales *were* conditional, the "patent exhaustion" defense is simply inapplicable as a matter of law. *See Anton/Bauer, Inc.*, 329 F.3d at 1349 (the "exhaustion" doctrine is based upon the proposition that there was an "unrestricted" sale); *Monsanto Co.*, 302 F.3d at 1299 (where something less than *all* of the patent rights have been conveyed, the "first sale" rule is inapplicable); *Jazz Photo Corp.*, 264 F.3d at 1105 (the "first sale" or "patent exhaustion" doctrine only applies where the first sale was "unrestricted"); *B. Braun Med., Inc.*, 124 F.3d at 1426 ("This exhaustion doctrine, however, does not apply to an expressly conditional sale or license."); *Mallinckrodt, Inc.*, 976 F.2d at 706 ("*[U]nconditional* sale of a patented device exhausts the patentee's right to control the purchaser's use of the device.") (emphasis added). Treating the winning party on this issue as the movant and the losing party as the party charged with adequately resisting the motion, the court finds that Pioneer has met its initial burden, *see Eli Lilly & Co.*, 251 F.3d at 971 (the party moving for summary judgment bears the burden "to show 'that there is an absence of evidence

to support the non-moving party's case" "), by pointing to evidence that, from 1986 on, its bag label restricted the uses for which the seed corn was sold to production of grain or forage. Even giving Ottawa the benefit of all reasonable inferences, *id.,* Ottawa's attempts to generate a genuine issue of material fact on its "patent exhaustion" defense are unavailing.

Ottawa attempts to generate a genuine issue of material fact by asserting that certain bag tags from bags it resold did not include any restrictions on use of the seed corn. However, the bag tags to which Ottawa points are dated 1992 and 1993, *see* Defendant's Appendix In Support Of Its Motion For Summary Judgment at 70, 76 & 79, which means that they antedate the sales season in which Pioneer represents that it first included the restrictions *on the bag tags,* which was 1996. Ottawa has pointed to nothing suggesting that the *bag labels* did not always carry restrictions on use. Ottawa also points to evidence that the purchase orders and invoices for the Pioneer ® brand seed corn that it bought from Pioneer Sales Representatives or dealers did not contain any limitations on the sale of the seed corn, but the bag labels and bag tags on the seed corn itself expressly stated that the terms thereon are terms and conditions of the sale. Although Ottawa argues that it is Pioneer's burden to show that the sale was conditional, the burdens at summary judgment require Ottawa to point to evidence that it bought bags of seed with no limitations, *see Eli Lilly & Co.,* 251 F.3d at 971 (the party moving for summary judgment bears the burden "to show 'that there is an absence of evidence to support the non-moving party's case' "), and Ottawa has not done so, nor has Ottawa denied that the bags it sold carried the label license. Because "[t]he principle of exhaustion of the patent right did not turn a conditional sale into an unconditional one," *Mallinckrodt,*

*Inc.,* 976 F.2d at 706, there was no unconditional sale in this case upon which "patent exhaustion" could be founded.

Finally, the court is unpersuaded by Ottawa's arguments, in its reply in further support of its own motion for summary judgment, that Pioneer's "limited label license" simply does not restrict or prohibit Ottawa's right to "resell" Pioneer ® brand seed corn, even if it restricts other "uses." While this argument is relevant to the nature of the conditions on the first sale of the patented seed corn by Pioneer—a matter that the court must address below—it is not responsive to the pertinent issue at this point in the analysis, which is whether or not there ever was an *unconditional* sale of the seed corn. *See Anton/Bauer, Inc.,* 329 F.3d at 1349 (the "exhaustion" doctrine is based upon the proposition that there was an "unrestricted" sale); *Monsanto Co.,* 302 F.3d at 1299 (where something less than *all* of the patent rights have been conveyed, the "first sale" rule is inapplicable); *Jazz Photo Corp.,* 264 F.3d at 1105 (the "first sale" or "patent exhaustion" doctrine only applies where the first sale was "unrestricted"); *B. Braun Med., Inc.,* 124 F.3d at 1426 ("This exhaustion doctrine, however, does not apply to an expressly conditional sale or license."); *Mallinckrodt, Inc.,* 976 F.2d at 706 ("*[U]nconditional* sale of a patented device exhausts the patentee's right to control the purchaser's use of the device.") (emphasis added); *see also Eli Lilly & Co.,* 251 F.3d at 962 ("A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceedings."). Thus, Ottawa has failed to generate a genuine issue of material fact as to the applicability of the "first sale" or "patent exhaustion" defense in this case. *See Eli Lilly & Co.,* 251 F.3d at 971 ("[T]he nonmoving party must affirmatively demonstrate by specific fac-

tual allegations that a genuine issue of material fact exists for trial.").

Therefore, unless the court determines that the conditions Pioneer placed on its initial sale of the seed corn are unenforceable, Ottawa's "patent exhaustion" defense must fail as a matter of law, because there was no "first" *unconditional* sale.

### 2. Restrictions in the "limited label license"

Ottawa next contends that it is entitled to summary judgment on Pioneer's patent infringement claim on the grounds that (1) Pioneer has failed to produce any evidence sufficient to prove that there was a contractual provision prohibiting resale appearing on any seed bags or bag tags purchased and resold by Ottawa, and (2) Pioneer has failed to produce any evidence sufficient to prove that Ottawa had actual notice of any such restrictions on resale. Pioneer contends, in resistance to Ottawa's motion and in support of its own motion for partial summary judgment, that there is no genuine issue of material fact that the "limited label license" prohibits resale of the seed corn and that Ottawa was adequately notified of that fact.

### a. Arguments of the parties

Although Ottawa acknowledges that private parties are free to place express conditions on the sale of patented products, Ottawa contends that such express conditions are subject to basic contract principles. Therefore, Ottawa contends that Pioneer must establish not only that it intended to convey only restricted rights, not including a right to resell, but that Ottawa had notice that the limited rights that it obtained did not include the right to resell the seed corn. Ottawa contends that Pioneer has offered no evidence that the so-called "limited label license" even appeared on any of the bags of seed corn purchased and resold by Ottawa or that Ottawa had actual knowledge of such restrictions before purchasing the corn.

In response to Ottawa's motion for summary judgment, and in support of its own motion for summary judgment, Pioneer contends that Ottawa cannot dispute the existence of the bag label or bag tag licenses or that Ottawa's employees were aware of and looked at the bag labels and bag tags. Pioneer contends that Ottawa's argument that its employees never read the *limitations* on the bag labels and bag tags simply is not credible. On the other hand, Pioneer contends that attachment of a label to a product is an acceptable means of communicating license terms to a purchaser, and that, at all times since 1986, it has used language on all or substantially all of its bag labels prohibiting the use of the seed for any purpose other than to produce forage or grain, and since 1996, it has used bag tags using comparable restrictive language or pointing out that restrictions on the conditions of sale were to be found on the bag label. Pioneer contends that, under the circumstances, Ottawa must be deemed to have had notice of the conditions of sale for the seed corn.

In its reply in further support of its own motion for summary judgment, and in resistance to Pioneer's motion for partial summary judgment on this issue, Ottawa argues that Pioneer's "use" restriction does not prohibit "resale," because the rights to use and sell a patented product are separate rights. Although Ottawa agrees that Pioneer has shown that it restricted purchasers' "use" of the seed corn, Pioneer has not shown that it restricted purchasers' rights to "sell" or "resell" the seed corn. Ottawa contends that, at best, Pioneer's language restricting certain "uses" of the seed corn is ambiguous as to its impact on "selling" or "reselling." Ot-

tawa also argues that Pioneer has not established that Ottawa had notice of any resale prohibition or that such a restriction was, in fact, placed on any of the bags of seed corn purchased and resold by Ottawa. Ottawa points out that Pioneer has not produced a single bag from a sale to Ottawa. Ottawa also asserts that Pioneer is required to show that Ottawa had *actual* notice of the restrictions, not simply that the restrictions appeared somewhere on the bag or bag tag. In its resistance to Pioneer's motion for partial summary judgment, Ottawa argues that Pioneer failed to take reasonable steps to ensure that buyers had notice of the restrictions that Pioneer was attempting to impose, because there are no express restrictions on resale on any labels or sales documents from the time period during which Ottawa was reselling Pioneer ® brand seed corn, nor did Pioneer require all buyers to execute a written license agreement.

### b. *Applicable law*

■ Section 154 of Title 35, a key provision of the Patent Act, provides that "every patent shall contain ... a grant to the patentee ... of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U.S.C. § 154(a)(1). Similarly, 35 U.S.C. § 271(a) provides that, "[e]xcept as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). In *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700 (Fed.Cir.1992), the Federal Circuit Court of Appeals noted that "the sale of patented goods, like other goods, can be conditioned." *Mallinckrodt, Inc.*, 976 F.2d at 706. In other words, some or all of the rights granted by § 154

can be reserved to the patent holder or those rights can be waived in whole or in part. *See id.* at 703 ("The enforceability of restrictions on use of patented goods derives from the patent grant, which is in classical terms of property: the right to exclude [and][t]his right to exclude may be waived in whole or in part.").

■ At least in the first instance, the conditions of a waiver of patent rights— *i.e.*, the terms of a grant of a license to make, use, or sell the patented item—are subject to contract considerations. *Id.* The court reviews the interpretation of contractual language, including license agreements, as a question of law. *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1466 (Fed.Cir.1998), *cert. denied*, 525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229 (1998). "State law controls in matters of contract interpretation." *Id.*

This court recently summarized the Iowa rules of contract interpretation and construction as follows:

This court has recognized that Iowa law distinguishes between "interpretation" and "construction" of a contract. *See Kaydon Acquisition Corp. v. America Central Indus., Inc.*, 179 F.Supp.2d 1022, 1037 (N.D.Iowa 2001). When the dispute concerns the meaning of certain contract terms, the court must engage in the process of interpretation, rather than construction. *See id.* (citing *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001); *Fausel v. JRJ Enters., Inc.*, 603 N.W.2d 612, 618 (Iowa 1999), which notes that interpretation is "a process for determining the meaning of words in a contract" while construction is "a process of determining the legal effect of such words"; and *Fashion Fabrics of Iowa v. Retail Investors Corp.*, 266 N.W.2d 22, 25 (Iowa 1978), which states, "Interpretation involves ascertaining the

meaning of contractual words; construction refers to deciding their legal effect."). As this court has noted,

> The Iowa Supreme Court has explained that:
>
> > The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co. [v. Hartig]*, 602 N.W.2d [794,] 797 [ (Iowa 1999) ]. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." *Restatement ( Second) of Contracts* § 202 cmt. a, at 87 (1981). In so doing, the court determines whether a disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. *Hartig Drug Co.*, 602 N.W.2d at 797. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.*
> >
> > Once an ambiguity is identified, the court must then "choos[e] among possible meanings." *Restatement (Second) of Contracts* § 202 cmt. a, at 87. If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact. *Fausel*, 603 N.W.2d at 618.
>
> *Walsh*, 622 N.W.2d at 503.

*Kaydon Acquisition Corp.*, 179 F.Supp.2d at 1037–38. As to "pertinent rules of interpretation," the Iowa Supreme Court has explained that "We . . . do not interpret [any] contractual term apart from the context of the agreement as a whole. . . . The parties' intent as evidenced by all of the terms of the contract controls our conclusion." *Koe-*

*nigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003). "Interpretation" is "a question of law for the court unless the meaning of disputed terms turns on extrinsic facts or choices among reasonable inferences." *Grinnell Select Ins. Co. v. Continental Western Ins. Co.*, 639 N.W.2d 31, 33 (Iowa 2002).

On the other hand, where the dispute centers on determining the legal effect of contractual terms, the court engages in the process of construction, rather than interpretation. *See Fausel*, 603 N.W.2d at 618; *Fashion Fabrics of Iowa*, 266 N.W.2d at 25. "In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity, this is determined by what the contract itself says." IOWA R. APP. P. 6.14(6)(n). The Iowa Supreme Court has explained that "construction" is "always a question of law." *See Grinnell Select Ins. Co.*, 639 N.W.2d at 33.

*Central States Indus. Supply, Inc. v. McCullough*, 279 F.Supp.2d 1005, 1031–33, 2003 WL 22048226, *20–*21 (N.D.Iowa Sept.3, 2003).

Illinois rules of interpretation and construction are similar. As the Illinois Court of Appeals recently explained, under Illinois law,

> When the language of a contract is clear and unambiguous, construction of the contract is a matter of law that is subject to de novo review. A court must construe the meaning of a contract by examining the language and may not interpret the contract in a way contrary to the plain and obvious meaning of its terms. Unless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning. Furthermore, the court must place the meanings of words within the context of the con-

tract as a whole. A contract term is ambiguous when it may reasonably be interpreted in more than one way. The mere fact that the parties disagree on some term, however, does not render the term ambiguous. *J.M. Beals Enterprises, Inc. v. Industrial Hard Chrome, Ltd.*, 194 Ill.App.3d 744, 748, 141 Ill.Dec. 347, 551 N.E.2d 340 (1990). "A court will neither add language or matters to a contract about which the instrument itself is silent, nor add words or terms to an agreement to change the plain meaning of the parties as expressed in the agreement." *Sheehy v. Sheehy*, 299 Ill. App.3d 996, 1001, 234 Ill.Dec. 34, 702 N.E.2d 200 (1998).

If the language of the contract is facially unambiguous, then the "four corners" rule requires the trial court to interpret the contract as a matter of law without the use of parol evidence. If, however, the language of the contract is susceptible to more than one meaning, then an ambiguity is present and parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill.2d 457, 462–63, 236 Ill.Dec. 8, 706 N.E.2d 882 (1999).

*Dean Mgmt., Inc. v. TBS Constr., Inc.*, 339 Ill.App.3d 263, 274 Ill.Dec. 161, 790 N.E.2d 934, 939–40 (Ill.Ct.App.2003). Because Iowa and Illinois rules of interpretation are similar, the court finds it unnecessary to decide which state's law applies to interpretation of the license language here.

#### c. Analysis

■ **i. Interpretation of the restrictive language.** Although each of the "ex-clusive" rights identified in § 154 may be in some sense "distinct," the court is not convinced that each category of right must be separately and expressly reserved, as Ottawa appears to contend by arguing that Pioneer's "limited label license" prior to 1999 failed to include any express restriction on "resale" of the patented seed corn. Ottawa's strained readings of various cases involving restrictions on "use" as showing that restrictions on "resale" are distinct and separate, and thus must be separately and expressly stated, are simply unavailing, at least in the face of language in a license unambiguously granting a buyer only very limited rights.[5] To put it another way, where, as here, the "limited label license" expressly grants only *some* of the rights identified in § 154, it follows that the only reasonably possible meaning of the language is that *all other rights* are reserved. *See Central States Indus. Supply, Inc.*, 279 F.Supp.2d at 1032–33, 2003 WL 22048226 at *21 (under Iowa law, interpretation requires the court to determine what meanings are reasonably possible); *Dean Mgmt., Inc.*, 274 Ill.Dec. 161, 790 N.E.2d at 939 (under Illinois law, a contract is not ambiguous unless there is more than one reasonable interpretation). This might be described as an application of the contract principle of *expressio unius est exclusio alterius*, that is, expression of one thing is the exclusion of another. It is also the plain meaning of what the "limited label license" says in this case. *See id.* at 1031–33, 2003 WL 22048226 at *20–*21 (under Iowa law, construction and interpretation are controlled by what the contract says, in the absence of ambiguity); *Dean Mgmt., Inc.*, 274 Ill.Dec. 161, 790

---

**5.** Indeed, in *General Talking Pictures Corp. v. Western Electric Co.*, 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938), the Supreme Court, in its consideration of a license "to manufacture ... and to sell," noted that "[p]atent owners may grant licenses extend-ing to all uses or limited to use in a defined field," *see General Talking Pictures*, 304 U.S. at 181, 58 S.Ct. 849, thereby suggesting that "use" is the generic term encompassing all of a patent holder's rights, including manufacture and sale.

N.E.2d at 939–40 (under Illinois law, "[u]nless the contract clearly defines its terms, the court must give the contractual language its common and generally accepted meaning," and, in the absence of ambiguity, the meaning of contract language is determined by examining the language and such language must not be interpreted in a way contrary to the plain and obvious meaning of the terms); *see also Mallinckrodt,* 976 F.2d at 703 (the rights granted to the patentee can be waived in whole or in part). Ottawa's disagreement with this interpretation does not create an ambiguity. *See id.; Dean Mgmt., Inc.,* 274 Ill.Dec. 161, 790 N.E.2d at 939. Moreover, Ottawa's contention that patent rights must be expressly *reserved* or they are *waived* stands on its head the principle that the patentee's right under the patent is the right to exclude.

■ Looking once again at the language upon which Pioneer relies, from 1986 to 1995, Pioneer's bag labels contained the following limited grant of rights to use the patented seed: *"Buyer agrees that purchase of this bag of seed does not give any rights to use any such parental line seed which may be found herein, or any plant, pollen or seed produced from such parental line seed, for breeding, research or seed production purposes or for any purpose other than production of forage or grain for feeding or processing."* Hall Affidavit, ¶ 16, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 3 (emphasis added). Similarly, for sales years 1996 through 1998, the label license read, in pertinent part, "Customer agrees that it is not acquiring the rights to use any parental line for any purpose other than production of forage or grain for feeding or processing. If the tag indicated this product is produced under one or more U.S. patents, customer is licensed thereunder only to produce forage or grain for feeding or processing." Hall Affidavit, ¶ 17, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 3–4. The court finds that the meaning of the clear, unambiguous language of the bag labels at issue in this case is that the *only* right granted to a buyer was the right to use the seed to produce forage or grain, *thereby reserving all other rights to the patentee,* including the right to sell or resell.

The intent to grant only the rights identified in the label licenses is also confirmed by the language of the bag tags. Beginning in 1996, the bag tag including the following statement: *"This product is for license only.* PIONEER ® brand products are sold subject to the terms and conditions of sale which are part of the labeling and sale documents." Hall Affidavit, ¶ 21, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 5 (emphasis added). After identifying the patent numbers for seed corn in each bag, the bag tag continued, as follows: *"License is granted solely to produce grain and/or forage.* For other licenses, contact Pioneer Hi–Bred International, Inc. . . . PIONEER ® brand products are sold subject to the terms and conditions of sale which are part of the labeling and sale documents." *Id.* at ¶ 22, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 5 (emphasis added). The bag label and bag tag unambiguously grant *only* a right to use the seed corn to produce grain or forage; the label and tag unambiguously *do not* grant a buyer the right to resell Pioneer ® brand seed corn unless the buyer is separately licensed to resell the product, for example, under a dealer license from Pioneer.[6]

---

**6.** The court recognizes that it is here relying on several of the paragraphs of Mr. Hall's

***ii. Presence of the restriction on bags purchased by Ottawa.*** The court turns, next, to the question of whether or not Pioneer has shown beyond dispute, or has generated a genuine issue of material fact, that the limited license upon which Pioneer relies appeared on any of the bags of Pioneer ® brand seed corn that Ottawa acquired, then resold. The court's analysis on this issue is similar to its analysis of the question of whether Pioneer's sale of its seed corn was "conditional," for purposes of the applicability of Ottawa's "patent exhaustion" defense. The court concludes that Ottawa has failed to generate any genuine issue of material fact that the "limited label license" was missing from the bag labels and bag tags of Pioneer ® brand seed corn that Ottawa purchased and resold. Again, the bag tags that Ottawa asserts did not contain the limitations language are from years prior to the date that Pioneer represents that it began including such language on bag tags. Moreover, Ottawa has pointed to nothing suggesting that, throughout the applicable time period, the *bag labels* did not always carry the restrictions on which Pioneer relies. Although Ottawa contends that purchase orders and invoices memorializing its purchase of Pioneer ® brand seed corn from Pioneer do not contain limitations language, the bag labels at all times pertinent here, and the bag tags from 1996 onward, all expressly stated that the terms thereon were terms and conditions of the sale. Ottawa has failed to point to any evidence that it bought bags of seed with no limitations on the label or tag, and has not denied that the bags it sold carried the label license. Thus, Ottawa has failed to generate any genuine issue of material fact that it purchased seed corn that was not labeled with the pertinent limitations.

***iii. Ottawa's notice.*** Nevertheless, Ottawa also contends that it is entitled to summary judgment on Pioneer's patent infringement claim on the ground that it had no *actual* notice of the limitations on the resale of Pioneer ® brand seed corn, because its representatives did not read and had no reason to read the limitations on the bag labels, no such limitations appeared in other sales documents, and thus, Pioneer did not take reasonable steps, such as a signed licensing agreement, to communicate its purported limitations on the license for the seed corn to buyers before the sale. Pioneer contends that, as a matter of law, it took adequate steps to communicate the limitations to buyers, by placing the limitations on the labels and bag tags of the actual product, so that Ottawa had notice of the limitations; Pioneer contends that Ottawa's protestations to the contrary, on the ground that its employees never read and had no reason to read the label limitations, simply are not credible. The court concludes that this issue really comes down to whether or not Pioneer's bag labels and bag tags were an adequate means of notifying buyers of the limited rights that they acquired in the patented seed corn.

■ Pioneer relies on *Chemagro Corp. v. Universal Chemical Company,* 244 F.Supp. 486 (D.C.Tex.1965), as supporting the adequacy of notice in this case. In *Chemagro,* the plaintiff placed "a limited

---

affidavit that Ottawa has challenged. These paragraphs, however, are specific examples of the court's general observation that any differences between Mr. Hall's deposition testimony and his affidavit appear to be primarily clarifications and amplifications in his affidavit of issues addressed in his deposition or

matters on which he professed lack of knowledge or memory *at the time of his deposition.* Thus, these paragraphs do not offend the standards for consideration of a subsequent affidavit. *See Helm Fin. Corp.,* 214 F.Supp.2d at 955.

patent license" on certain uses and sale of its patented products on a written label notice attached to the patented product. *See Chemagro Corp.*, 244 F.Supp. at 490. The court in *Chemagro* held that "Defendants, *having actual notice of a limited patent license in the form of a written label notice* attached to [the product] prohibiting the reformulation and sale thereof for use by the home gardener, have infringed the patent in suit when the reformulated and sold said [product] in the home garden field." *Id.* (emphasis added). Ottawa contends that this case stands for the proposition that the buyer must have actual notice of the label limitations, but Pioneer contends that it stands for the proposition *that the label limitations provide actual notice.* The key finding in *Chemagro,* for present purposes, this court concludes, was the following: "Prior to the date that the defendants first sold [their product incorporating a reformulation of the plaintiff's insecticide] in the home garden field, they, through their President, H. Dean Smith, had actual notice of the aforesaid limited patent license [on the product label] prohibiting the reformulation and sale of [the plaintiff's patented product] for use by the home gardener, and the jury so found." *Id.* Although the decision does not reveal what evidence the jury relied on for their finding that the defendant had "actual notice" of the label license, it appears that the jury found "actual notice" *of* the label license, not "actual notice" *from* the label license. Thus, *Chemagro* does not stand for the broad rule Pioneer attempts to draw from it.

The decision in *Chemagro* relied on *General Talking Pictures Corp. v. Western Electric Co.,* 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273 (1938), for the "actual notice" requirement. Among other questions, the petition for certiorari in *General Talking Pictures* presented this question:

2. Can a patent owner, merely by a "license notice" attached to a device made under the patent, and sold in the ordinary channels of trade, place an enforceable restriction on the purchaser thereof as to the use to which the purchaser may put the device?

*General Talking Pictures,* 304 U.S. at 177, 58 S.Ct. 849. However, the Court found that this question "need not be considered," where the alleged infringer knew that the party from which it purchased the patented device was not authorized to sell it to such entities as the alleged infringer. *See id.* at 181–82, 58 S.Ct. 849. Thus, *General Talking Pictures* neither requires "actual notice," nor suggests what other form of notice might suffice, although it makes clear that "actual notice" plainly suffices. Similarly, although the issue of whether a "label license" provides adequate notice of the terms of the license might have arisen in the circumstances presented in *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700 (Fed.Cir.1992), the court noted that "[t]he movant Medipart did not dispute actual notice of the restriction. Thus we do not decide whether the form of the restriction met the legal requirements of notice or sufficed as a 'label license', as Mallinckrodt calls it, for those questions were not presented on this motion for summary judgment." *Mallinckrodt, Inc.,* 976 F.2d at 701. Thus, the court must, once again, look elsewhere for more specific guidance.

Although the parties have not relied on them, the court finds some guidance from other authorities. First, the so-called patent "marking" statute, 35 U.S.C. § 287, provides that "marking" a product with patent numbers suffices to provide notice to another of the patentee's rights; in the absence of such "marking," the alleged infringer must be given *actual* notice of alleged infringement for the patentee to recover damages. *See* 35 U.S.C. § 287(a);

see also *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed.Cir.2001) ("The statute permits either constructive notice, which is accomplished by marking the article with the patent number, or actual notice."), *cert. denied*, 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). If "marking" of a product with patent numbers suffices to provide notice of a patentee's whole bundle of patent rights, it would seem to follow that "marking" of a product with a clear, unambiguous license of only some of the patentee's rights should also suffice, as a matter of law, to put a buyer on notice of the limitations in the license. The court finds that, as a matter of law, the "limited label license," which the court has held clearly and unambiguously conveyed only a limited right to produce grain or forage, provided constructive notice to Ottawa of the limited rights obtained by a purchaser.

Second, even if "actual notice" is required, it cannot be disputed that Ottawa's employees and representatives were aware of the bag labels and bag tags, because they admitted reading them, at least for information concerning seed size, maturity, etc. Also, the limited license provision on the bag labels appeared below a notice, in capital letters, that "THE FOLLOWING PROVISIONS ARE PART OF THE TERMS OF SALE OF THIS PRODUCT." Under these circumstances, the court cannot find that a party's selective reading of label language, or failure to read certain terms, can stand as a defense to the sufficiency of notice provided by unambiguous limitations on the label, at least where there is no genuine issue of material fact that the label was designed to come to the attention of any reasonable purchaser. This view is in accord with contract principles, under which certain provisions that, like a limitation on a license, limit a buyer's rights—such as disclaimers or waivers of warranties—may be ineffective if they are "hidden" from the purchaser by location in an obscure or unexpected location in the contract documents or in fine-print "boilerplate" provisions, but are generally effective if prominent or conspicuous. *See, e.g., Dailey v. Holiday Distributing Corp.*, 260 Iowa 859, 151 N.W.2d 477, 485 (Iowa 1967); *Basselen v. General Motors Corp.*, 341 Ill.App.3d 278, 275 Ill.Dec. 267, 792 N.E.2d 498, 508 (2003) (although certain disclaimers of warranties were in smaller print, and could be disregarded, "as is" disclaimer was in "conspicuous print" and in a "prominent" place in the middle of the form, and was therefore effective).

The court finds that, as a matter of law, Ottawa had sufficient notice of the limitations in the "limited label license" for those limitations to be enforceable against Ottawa, and it is, therefore, Pioneer, not Ottawa, that is entitled to summary judgment on this issue.

### 3. Enforceability of the label restrictions

As the next issue in its motion for summary judgment, Ottawa contends that Pioneer's restrictions on resale are unenforceable, as against public policy, because they are anticompetitive in effect, or violate contract principles, so that Pioneer's infringement claim premised on its restrictions on resale must fail. In resistance to Ottawa's motion, and in support of its own motion for summary judgment on this issue, Pioneer contends that, as a matter of law, its label restrictions are enforceable.

#### a. Arguments of the parties

Ottawa acknowledges that a patentee may put conditions on the sale of a patented product, if such restrictions or conditions are reasonably within the patent grant. Because Ottawa contends that Pioneer has already received the value of its

patent once, in a "first sale," Ottawa contends that Pioneer's attempt to prohibit resale is an anticompetitive extension of Pioneer's patent rights unreasonably beyond the scope of the patent grant. Ottawa contends that Pioneer's restrictions could stifle the resale market on websites like E–Bay, by preventing individuals from selling common items, such as used cars or furniture, if any of the essential components of the items are patented and purportedly "labeled" with a restriction on resale.

In response to Ottawa's motion for summary judgment, Pioneer argues that the cases on which Ottawa relies for the supposed anticompetitive effect of restrictions on resale all are distinguishable, because each involved a restriction beyond the prohibition on resale, including resale price fixing or "tying" of the resale of the patented item to other products, which were outside the scope of the original patent monopoly, and ran afoul of antitrust laws. In contrast, Pioneer contends that the Federal Circuit Court of Appeals has recognized that not all restrictions on resale of patented items are illegal. Here, Pioneer contends that its restriction on resale is well within the scope of its original patent rights. In support of its own motion for partial summary judgment, Pioneer also contends that restrictive or limited licensing of patented products is a longstanding, legal practice; that such limited licenses have been upheld in the context of biotechnology patents; that the label limitations here are similar to software shrinkwrap licenses, which have been upheld by the courts; and that there is no anticompetitive effect exceeding the scope of the original patent rights. Thus, Pioneer contends that its limitations on resale are enforceable.

In its reply in further support of its own motion for summary judgment, Ottawa

contends that Pioneer's restriction on resale is designed primarily for the anticompetitive purposes of disciplining its sales force, limiting its dealers' ability to set their own prices, and controlling the price of Pioneer's products in the resale market. In its resistance to Pioneer's motion for summary judgment, Ottawa argues that contract principles are applicable to the enforceability of licensing restrictions on patented items and that the licensing restrictions purportedly imposed by Pioneer's limited label licenses violate such contract principles, because they were undisclosed and materially altered the terms of the contract for Ottawa's purchase of the seed corn.

In reply to Ottawa's arguments concerning contract principles, Pioneer argues that its "limited label license" restrictions on resale are still enforceable, because Ottawa failed to object to the restrictions and return the seed corn within a reasonable time. Also, because the terms of the restrictions were on the product itself, Pioneer contends that they were integral terms of the agreement to sell and purchase the seed corn, not terms that materially altered any agreement for the sale and purchase of the seed corn, or that, in the alternative, Ottawa had notice of such limitations after buying its first bags of seed corn, and therefore cannot argue that the limitations surprised Ottawa or materially altered the terms of any subsequent purchases.

#### b. Applicable law and analysis

■ *i. Permissible restrictions.* In *Mallinckrodt, Inc.,* the Federal Circuit Court of Appeals rejected the proposition that *no* restriction upon a purchaser of a sold article is enforceable under patent law, holding instead that "not all restrictions on the use of patented goods are unenforceable." *Mallinckrodt, Inc.,* 976

F.2d at 703. Indeed, the Federal Circuit Court of Appeals subsequently noted that "express conditions accompanying the sale or license of a patented product are generally upheld." *B. Braun Med., Inc.*, 124 F.3d at 1426 (citing *Mallinckrodt,* 976 F.2d at 708). However, "[s]uch express conditions ... are contractual in nature and are subject to antitrust, patent, contract, and any other applicable law, as well as equitable considerations such as patent misuse." *Id.*

> Accordingly, conditions that violate some law or equitable consideration are unenforceable. On the other hand, violation of valid conditions entitles the patentee to a remedy for either patent infringement or breach of contract. *See Mallinckrodt,* 976 F.2d at 707 n. 6, 24 USPQ2d at 1178–79 n. 6. This, then, is the general framework.

*B. Braun Med., Inc.*, 124 F.3d at 1426. Although restrictions in a patent license may be generally enforceable, Ottawa contends that Pioneer's "limited label license" is unenforceable, because of its anticompetitive effects and because it violates contract principles.

***ii. Scope of the patent rights and anticompetitive effects.*** Ottawa contends, first, that the "limited label license" is unenforceable, because it exceeds the scope of Pioneer's patent rights and has anticompetitive effects, which Pioneer disputes. In *Mallinckrodt, Inc.,* the Federal Circuit Court of Appeals surveyed Supreme Court precedent regarding the enforceability of restricted licenses and concluded "that price-fixing and tying restrictions accompanying the sale of patented goods were *per se* illegal." *Mallinckrodt, Inc.,* 976 F.2d at 704. However, the court also explained that other restrictions may be legal:

> These cases did not hold, and it did not follow, that all restrictions accompany-

ing the sale of patented goods were deemed illegal. In *General Talking Pictures* the Court, discussing restrictions on use, summarized the state of the law as follows:

> > That a restrictive license is legal seems clear. *Mitchell v. Hawley* [83 U.S.] (16 Wall.) 544 [21 L.Ed. 322 (1873)]. As was said in *United States v. General Electric Co.,* 272 U.S. 476, 489 [47 S.Ct. 192, 196, 71 L.Ed. 362 (1926)], the patentee may grant a license "upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure" ....
> >
> > The practice of granting licenses for restricted use is an old one, *see Rubber Company v. Goodyear* [76 U.S.] (9 Wall.) 788, 799, 800 [19 L.Ed. 566 (1870) ]; *Gamewell Fire–Alarm Telegraph Co. v. Brooklyn,* 14 F. 255 (C.C.N.Y.1882)]. So far as it appears, its legality has never been questioned.
> 
> 305 U.S. at 127, 59 S.Ct. at 117, 83 L.Ed. 81, 39 USPQ at 330.

*Mallinckrodt, Inc.,* 976 F.2d at 704–5.

The court in *Mallinckrodt, Inc.,* also set out the framework for analysis of whether or not a license is enforceable. First, "[r]estrictions on use are judged in terms of their relation to the patentee's right to exclude from all or part of the patent grant." *Id.* at 706; *see also B. Braun Medical, Inc.,* 124 F.3d at 1426 ("The key inquiry under this fact-intensive doctrine is whether, by imposing the condition, the patentee has 'impermissibly broadened the "physical or temporal" scope of the patent grant with anticompetitive effect.' ") (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001–02 (Fed.Cir.), *cert. denied, cert. denied,* 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986)). "Should the restriction be found

to be reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims, that ends the inquiry." *Id.* at 708. On the other hand, "should such inquiry lead to the conclusion that there are anticompetitive effects extending beyond the patentee's statutory right to exclude, these effects do not automatically impeach the restriction," because, unless the restrictions are *per se* illegal, the rule of reason applies to determine whether or not the license is enforceable. *Mallinckrodt, Inc.*, 976 F.2d at 708. Under the rule of reason, " '[t]o sustain a misuse defense involving a licensing arrangement not held to have been *per se* anticompetitive by the Supreme Court, a factual determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market.' " *Id.* at 706 (quoting *Windsurfing International, Inc.*, 782 F.2d at 1001–02).

In *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed.Cir.1997), the Federal Circuit Court of Appeals gave examples of "impermissible broadening" as (1) "using a patent which enjoys market power in the relevant market to restrain competition in an unpatented product, and (2) employing the patent beyond its 17–year term." *B. Braun Medical, Inc.*, 124 F.3d at 1426 (internal citations omitted). However, the court added that "field of use restrictions ... are generally upheld." *Id.* Similarly, in *Mallinckrodt, Inc.*, the court noted that, in *General Talking Pictures*, the Supreme Court "observed that a restrictive license to a particular use was permissible, and treated the purchaser's unauthorized use as infringement of the patent." *Mallinckrodt, Inc.*, 976 F.2d at 705.

Turning to the key inquiry of whether the challenged restrictions in the license in this case are reasonably within the patent grant, *Mallinckrodt, Inc.*, 976

F.2d at 708; *accord B. Braun Medical, Inc.*, 124 F.3d at 1426, this court notes that the Patent Act provides that "every patent shall contain ... a grant to the patentee ... of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U.S.C. § 154(a)(1). Thus, Pioneer's express limitation on any use other than production of grain or forage, which reserves to Pioneer the right to sell the invention, as stated, falls squarely within the patent grant. To put it another way, the restrictions in the Pioneer "limited label license" are "field of use restrictions," and such restrictions "are generally upheld." *B. Braun Medical, Inc.*, 124 F.3d at 1426; *Mallinckrodt, Inc.*, 976 F.2d at 705 ("[A] restrictive license to a particular use [i]s permissible."). Certainly, Ottawa has not asserted that the "limited label license" improperly attempts to employ the patent beyond its statutory term. *B. Braun Medical, Inc.*, 124 F.3d at 1426.

Nor, the court concludes, has Ottawa pointed to any evidence of price-fixing and tying restrictions accompanying the sale of the patented goods, which would be *per se* illegal. *See Mallinckrodt, Inc.*, 976 F.2d at 704. The "limited label license" does not profess to require that any resale be at a certain price; rather, the right to resell is simply not granted at all. Similarly, the "limited label license" does not expressly or even impliedly tie purchase or sale of Pioneer ® brand seed corn to the purchase or sale of any other product. Thus, if there is any anticompetitive effect at all, it is not an anticompetitive effect that is *per se* illegal, and thus, the effect must be considered under the rule of reason. *Id.* at 708. Therefore, to overthrow the "limited label license" as a matter of law, or keep the issue in play for trial, Ottawa must demonstrate, or at least generate a genuine issue of material fact, that Pio-

neer's "limited label license" tends to restrain competition unlawfully in an appropriately defined relevant market. *Id.* at 706.

The court concludes that Ottawa has neither shown as a matter of law, nor generated a genuine issue of material fact, that the "limited label license" has the effect required for it to fail under the rule of reason, even granting that the pertinent inquiry is a "fact-intensive" one. The court finds no evidence in the record identifying restraints on competition within any appropriately defined relevant market. *See id.* At most, Ottawa asserts that Pioneer has imposed a prohibition on resale to discipline its licensed Sales Representatives and licensed dealers and to maintain prices, but Ottawa has pointed to no evidence demonstrating either such an intention or such an effect of the limited label license.

The "limited label license" at issue here is not, as a matter of law, unenforceable owing to any supposed anticompetitive effects.

***iii. Contract principles.*** Ottawa also contends that Pioneer's "limited label license" is unenforceable under "contract principles," which Pioneer disputes. This part of the parties' dispute centers on their disagreement about which subparagraph of § 2–207(2) of the Uniform Commercial Code (UCC) is applicable. The provision in question provides as follows:

2. The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

a. the offer expressly limits acceptance to the terms of the offer;

b. they materially alter it; or

c. notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

Uniform Commercial Code (UCC) § 2–207(2). Ottawa contends that subparagraph (b) makes the "limited label license" terms inapplicable here, because those terms materially altered the parties' contract, where none of the other sales documents indicated any limitation on the rights acquired by Ottawa. However, Pioneer contends that subparagraph (c) makes the "limited label license" enforceable, because Ottawa did not object to the terms of the "limited label license" within a reasonable time, indeed, never objected to those terms or returned the Pioneer ® brand seed corn that Ottawa had purchased after learning of the limited rights that Ottawa had acquired.

The Federal Circuit Court of Appeals does not appear to have addressed the impact of UCC § 2–207(2)(b) on the enforceability of a limited license for a patented product or, indeed, in any other context. However, the Official Comment to UCC § 2–207 clarifies the meaning of the term "materially alter" in subparagraph (b), as follows:

3. Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). *If they are such as materially to alter the original bargain, they will not be included unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.*

4. *Examples of typical clauses which would normally "materially alter" the contract and so result in surprise or hardship if incorporated without express awareness by the other party are: a clause negating such standard warran-*

ties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches; a clause requiring a guaranty of 90% or 100% deliveries in a case such as a contract by cannery, where the usage of the trade allows greater quantity leeways; a clause reserving to the seller the power to cancel upon the buyer's failure to meet any invoice when due; a clause requiring that complaints be made in a time materially shorter than customary or reasonable.

5. Examples of clauses which involve no element of unreasonable surprise and which therefore are to be incorporated in the contract unless notice of objection is seasonably given are: a clause setting forth and perhaps enlarging slightly upon the seller's exemption due to supervening causes beyond his control, similar to those covered by the provision of this Article on merchant's excuse by failure of presupposed conditions or a clause fixing in advance any reasonable formula of proration under such circumstances; a clause fixing a reasonable time for complaints within customary limits, or in the case of a purchase for sub-sale, providing for inspection by the sub-purchaser; a clause providing for interest on overdue invoices or fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for; a clause limiting the right of rejection for defects which fall within the customary trade tolerances for acceptance "with adjustment" or otherwise limiting remedy in a reasonable manner (see Sections 2–718 and 2–719).

UCC § 2–207, Official Comment (1989) (emphasis added).

In *Mallinckrodt, Inc.*, relying on UCC § 2–207(2)(c), the Federal Circuit Court of Appeals observed, "In accordance with the Uniform Commercial Code a license notice may become a term of sale, even if not part of the original transaction, if not objected to within a reasonable time." *Mallinckrodt, Inc.*, 976 F.2d at 708 n. 7. It is not clear that this observation is anything more than *dicta*, nor does it appear that the court in *Mallinckrodt, Inc.*, ever considered the effect of subparagraph (b) of UCC § 2–207(2). However, Official Comment 3 to UCC § 2–207 suggests that additional terms that materially alter the parties' agreement must be expressly accepted; only additional terms that do not materially alter the parties' agreement require objection to be excluded from the agreement pursuant to § 2–207(2)(c). Thus, this court does not believe that *Mallinckrodt* stands for the proposition that a party must always object to the terms of a limited license, pursuant to UCC § 2–207(2)(c), or the terms of the license are enforceable. Rather, terms that materially alter the parties agreement may be unenforceable, even in the absence of an objection.

Nevertheless, in *Monsanto Co. v. Scruggs*, 249 F.Supp.2d 746 (N.D.Miss. 2001), upon which Pioneer relies, the district court relied on the quoted language from *Mallinckrodt* to reject the argument of purchasers of seed that they had purchased the seed without executing a license agreement, even though restrictions appeared on the label of the seed. *Scruggs*, 249 F.Supp.2d at 754. The court held that, because the defendants had known about the restrictions on the use of the seed, from various sources, including the labels and trade journals, their failure to contest the terms of the license within a reasonable time after the sale suggested that Monsanto's licensing conditions became enforceable terms of the sale. *Id.* Thus, *Scruggs* stands for the proposition that *knowledge of the limitations plus fail-*

*ure to object* makes the terms of a "limited label license" enforceable, which is, in this court's view, a reasonable resolution of any tension between § 2–207(2)(b) (rejecting terms that materially alter the agreement) and § 2–207(2)(c) (accepting terms to which no objection has been made within a reasonable time), and in accord with Official Comment 3 to UCC § 2–207(2).[7]

Plainly, there is no evidence that Ottawa ever objected to the terms of the "limited label license," or ever returned any of the Pioneer ® brand seed corn that it had acquired to Pioneer after learning of the terms of the "limited label license." Thus, the terms of the "limited label license" became terms of the parties' agreement regarding the sale and purchase of Pioneer ® brand seed corn, even though the "limited label license" was not part of the original transaction, *see Mallinckrodt, Inc.,* 976 F.2d at 708 (citing UCC § 2–207(2)(c)), *unless,* as explained above, the terms of the "limited label license" materially altered the terms of the parties' agreement, and thus did not become part of the parties' agreement pursuant to UCC § 2–207(2)(b). *See* UCC § 2–207(2)(b) & Official Comment 3.

Again, whether or not an additional term "materially alters" the terms of the parties' agreement depends, in essence, on whether the additional term "result[s] in surprise or hardship if incorporated without express awareness by the other party." UCC § 2–207, Official Comment 4. Here, a limitation on the use of the Pioneer ® brand seed corn to produce grain or forage, which prohibits resale, would nei-

ther "surprise" nor cause "hardship" to the vast majority of purchasers of such seed corn, who are farmers who intend nothing other than using the seed corn to produce grain or forage. Nor would the restrictions imposed by the "limited label license" cause "surprise" or "hardship" to the only other usual "purchasers" of Pioneer ® brand seed corn, Pioneer licensed dealers, who were separately licensed to sell or resell only to persons who would use the seed corn to produce grain or forage or to other licensed dealers. The only persons who could profess to be "surprised" or subjected to "hardship" by the restriction on resale in the "limited label license" are persons or entities, like Ottawa, who purchased the seed corn for the purpose of reselling it, but *who were never supposed to be allowed to purchase the seed corn in the first place,* under the undisputed facts concerning Pioneer's dual distribution system.

Nor can Ottawa generate a genuine issue of material fact that it was, itself, actually "surprised" by the restriction on resale in the "limited label license." The court concluded, above, that, as a matter of law, the "limited label license" appeared on all of the bag labels of Pioneer ® brand seed corn that Ottawa purchased, and that, as a matter of law, such a "limited label license" provided Ottawa with adequate notice of the terms of the license. Thus, at least after its initial purchase of Pioneer ® brand seed corn, Ottawa could no longer profess to be surprised that the sale was subject to the terms of a "limited label license," and so, the "limited label license"

---

7. The court notes that both parties have devoted a good share of their briefs to arguing the applicability or inapplicability, and indeed, the persuasiveness and authority, of various decisions involving the application of UCC § 2–207(2) to so-called "shrinkwrap licenses" for computer software or other products. The court has not engaged in a similar

extended discussion of those precedents, because the court finds that the principles involved in UCC § 2–207(2), as explained in the text above, and the facts of this case suffice to reach the appropriate resolution of the cross-motions for summary judgment or partial summary judgment.

did not materially alter the terms of Ottawa's purchase of the seed corn within the meaning of UCC § 2–207(2)(b). *See* UCC § 2–207(2)(b) & Official Comment 4; *cf. Scruggs,* 249 F.Supp.2d at 754 (knowledge of the limitations in a license plus failure to object to those limitations makes the terms of a limited label license enforceable).

This case is, thus, controlled by UCC § 2–207(2)(c), not § 2–207(2)(b), and the absence of any objection to the terms of the "limited label license" by Ottawa means that the terms of the license became a part of the parties' agreement as a matter of law. *See* UCC § 2–207(2)(c) & Official Comment 3 (unless an additional term materially alters the parties' agreement, it becomes part of the agreement unless objected to within a reasonable time); *Mallinckrodt, Inc.,* 976 F.2d at 708 n. 7 ("In accordance with [UCC § 2–207(2)(c) ] a license notice may become a term of sale, even if not part of the original transaction, if not objected to within a reasonable time."). Pioneer is thus entitled to summary judgment on this last "liability" issue.

### C. Damages Issues

The remaining four issues, all of which relate to damages or the prerequisites for damages, are raised only in Ottawa's motion for summary judgment. Thus, Pioneer bears the burden of generating a genuine issue of material fact to defeat summary judgment on each of these issues. *See Eli Lilly & Co.,* 251 F.3d at 971 ("[T]he nonmoving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial.").

### 1. Marking or notice of patent rights

As the first of its challenges to Pioneer's ability to obtain damages in this case, Ottawa argues that Pioneer cannot satisfy the prerequisite for damages under 35 U.S.C. § 287(a), which states that, in the absence of adequate marking of a patented item with the pertinent patent number or numbers, "no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter. . . ." Pioneer contends that there are at least genuine issues of material fact as to whether or not it adequately "marked" its seed corn, making any other form of notice unnecessary.

#### a. Arguments of the parties

Ottawa contends that Pioneer simply failed to notify Ottawa of the existence of any of Pioneer's patents or that Pioneer was accusing Ottawa of infringing those patents until Pioneer filed the present lawsuit, at which time Ottawa ceased selling Pioneer ® brand seed corn. Ottawa also contends that Pioneer provided no evidence that it ever marked its products with the patent numbers of the patents-insuit, which might have excused Pioneer from giving other notice to Ottawa.

In response, Pioneer contends that compliance with § 287 requires only that the patentee consistently mark substantially all of its patented products with the pertinent patent numbers. Pioneer contends that such marking provides in rem notice and permits an award of damages against the infringer. Here, Pioneer contends that, beginning in 1996, it consistently marked substantially all of its seed corn products with bag tags stating the pertinent patent numbers in full compliance with § 287. Because it satisfied the "marking" requirement of § 287, Pioneer contends that it was not required to give any further "actual" notice to Ottawa before it is entitled to recover damages. However, Pioneer also contends that, both before and after 1996, its bag label provid-

ed "actual notice" as required by § 287 as an alternative to "marking."

In reply, Ottawa contends that there is no evidence that Pioneer marked its bags in compliance with § 287(a). Ottawa contends that this is so, because Pioneer has offered no evidence showing precisely when and during what period Pioneer's bags were marked with any particular patent numbers. Ottawa points out that the bag tags it has offered into the record do not include any patent numbers.

#### b. Applicable law

■ The so-called "marking" statute, 35 U.S.C. § 287(a), provides as follows:

(a) Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. *In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.* Filing of an action for infringement shall constitute such notice.

35 U.S.C. § 287(a) (emphasis added). As the Federal Circuit Court of Appeals recently explained,

The statute does not specify when or under what circumstances damages may be recovered. Rather, it describes circumstances that effect a forfeiture of

damages.... 35 U.S.C. § 287(a) (2000). Thus, section 287 "penalizes the use of unauthorized marks upon manufactured articles" and limits the extent to which damages may be recovered where products covered by a U.S. patent are sold without the notice defined in the statute. *Wine Railway [Appliance Co. v. Enterprise Railway Equipment Co.],* 297 U.S. [387,] 393, 56 S.Ct. [528,] 528, 80 L.Ed. 736 [ (1936) ]. The recovery of damages is not limited where there is no failure to mark, i.e., where the proper patent notice appears on products or where there are no products to mark. *Id.* As the Supreme Court so aptly stated:

The idea of a tangible article proclaiming its own character runs through this and related provisions. Two kinds of notice are specified—one to the public by a visible mark, another by actual advice to the infringer. The second becomes necessary only when the first has not been given; and the first can only be given in connection with some fabricated article. Penalty for failure implies opportunity to perform.

*Id.* at 395, 56 S.Ct. 528.

*Texas Digital Systems, Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1219–20 (Fed.Cir. 2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 2230, 155 L.Ed.2d 1108 (2003). Thus, "[t]he statute permits either constructive notice, which is accomplished by marking the article with the patent number, or actual notice." *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1345 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).

In a case requiring "actual notice," that is, one in which the parties agreed that the patented device was not "marked," the Federal Circuit Court of Appeals explained that, although "compliance with the marking statute ... is a question of

fact, ... this issue is properly decided upon summary judgment when no reasonable jury could find that the patentee either has or has not provided actual notice to the particular defendants by informing them of his patent and of their infringement of it." *Gart*, 254 F.3d at 1339 (internal citations and quotation marks omitted). Similarly, where, as here, the parties dispute whether or not the patented item was adequately "marked," summary judgment in Ottawa's favor would be appropriate only if no reasonable jury could find that the patentee, Pioneer, *marked* the patented product *and*, failing such "marking," no reasonable jury could find that Pioneer provided actual notice. *Cf. id.; see also Texas Digital Systems, Inc.*, 308 F.3d at 1219–20 (actual notice is required if the patentee has not "marked" the patented article).

#### c. Analysis

**i. Notice by "marking."** The court concludes that this is *not* one of the situations in which no reasonable jury could find that Pioneer has complied with the "marking" statute. *Cf. Gart*, 254 F.3d at 1339. At a minimum, Pioneer has generated genuine issues of material fact on the question by pointing to evidence that, from 1996 on, it marked all or substantially all of its bag tags with the pertinent patent numbers for each variety of its patented seed corn. *See Eli Lilly & Co.*, 251 F.3d at 971 ("[T]he nonmoving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial."). Ottawa's evidence that certain tags were *not* marked is not dispositive, because the tags on which Ottawa relies are dated 1992 and 1993, prior to the date that Pioneer contends that it first started marking its bag tags with pertinent patent numbers, which was in the 1996 sales season. Moreover, the "marking" statute provides that, "when,

from the character of the article, [marking on the patented article] can not be done," the patentee can comply with the statute "by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice." 35 U.S.C. § 287(a). Thus, the "marking" statute itself authorizes "marking" via a "bag tag," as Pioneer contends that it has done in this case. Consequently, the court concludes that there are at least genuine issues of material fact as to whether or not Pioneer complied with the "constructive notice" portion of § 287(a), by "marking" the seed bags, *beginning with the 1996 sales season.*

**ii. Actual notice.** However, to recover damages for any sales by Ottawa prior to the 1996 sales season, because there was no "marking" via bag tags, Pioneer must demonstrate (or at this point, generate a genuine issue of material fact) that it provided Ottawa with "actual notice." 35 U.S.C. § 287(a); *Texas Digital Systems, Inc.*, 308 F.3d at 1219–20; *Gart*, 254 F.3d at 1345. Pioneer contends that, even prior to the 1996 sales season, Ottawa had "actual notice" of Pioneer's patents and that Pioneer was accusing Ottawa of infringement. Such "actual notice," Pioneer contends, came from the "limited label license."

As the Federal Circuit Court of Appeals has explained, for purposes of the "actual notice" requirement of § 287(a), "mere 'notice of the patent's existence or ownership' is not 'notice of infringement,' and as such would be insufficient to comply with section 287(a)." *Gart*, 254 F.3d at 1345 (citing *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed.Cir.1994)). Instead, " 'affirmative communication [to the alleged infringer] of a specific charge of infringement by a specific accused product or device' is required

to comply with section 287(a)." *Id.* (quoting *Amsted Indus., Inc.,* 24 F.3d at 187). Although a threat of suit for infringement is not required, " '[informing the alleged infringer] of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise' complies with the actual notice requirement of the marking statute." *Id.* at 1345 (quoting *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.,* 127 F.3d 1462, 1470 (Fed.Cir.1997)).

■ The "limited label license" on bags of Pioneer ® brand seed corn prior to the 1996 sales season, as quoted above, at page 7, *see* Hall Affidavit, ¶ 16, Plaintiff's Appendix In Support Of Its Motion For Partial Summary Judgment at 3, does not reference any patent, activity of the specific defendant believed by Pioneer to be infringement, threaten suit, or otherwise propose means of abatement. *Gart,* 254 F.3d at 1345. Therefore, the court concludes that, as a matter of law, the "limited label license" itself does not provide the "actual notice" required by the "marking" statute, even if it unambiguously notifies the buyer that the buyer is licensed only to produce grain or forage, not to resell the seed corn. Where a patentee fails to provide either the constructive notice, by marking, or the actual notice required by § 287(a), no damages can be recovered. *See* 35 U.S.C. § 287(a); *Texas Digital Systems, Inc.,* 308 F.3d at 1219–20.

Consequently, Ottawa's motion for summary judgment on the issue of damages will be granted as to any claim for damages prior to the 1996 sales season, but will be denied as to Pioneer's claim for damages for the 1996, 1997, and 1998 sales seasons.

### 2. Damages for infringement

Next, Ottawa contends that it is entitled to summary judgment on Pioneer's prayer for compensatory damages, because Pioneer has no evidence that any of the seed tags or seed bags purchased and resold by Ottawa contained any language prohibiting resale to support Pioneer's claim for damages under 35 U.S.C. § 284. In other words, Ottawa contends that, where there was no infringement, there can be no damages. Pioneer also disputes that summary judgment is appropriate on this issue.

### a. Arguments of the parties

Ottawa argues that § 284 allows an award of damages for infringement, but if there has been no infringement, there can be no award of damages. There is no evidence of infringement here, and hence, no possibility of damages, Ottawa contends, because Pioneer has not shown that it restricted the resale of any seed corn. Essentially, this "damages" argument is a repackaging of Ottawa's "liability" argument that Pioneer has presented no evidence demonstrating that a use or resale restriction was part of the contract between Pioneer and Ottawa or that Ottawa even had notice of any restrictions on resale when it made its sales. Thus, Ottawa argues that Pioneer is not entitled to damages for infringement.

Pioneer counters that, as explained in its own motion for partial summary judgment on "liability" issues, there is ample evidence that the restrictive label license appeared on every bag of its seed corn, that the label license is enforceable, and that Ottawa resold the seed corn notwithstanding the restrictions on doing so. Therefore, Pioneer contends that it is entitled to damages in some amount on its infringement claim.

### b. Applicable law

■ Section 284 of Title 35 provides, in pertinent part, as follows:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. The Federal Circuit Court of Appeals has held that "[t]he statute is unequivocal that the district court must award damages in an amount not less than a reasonable royalty" upon a finding of infringement. *See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed.Cir.2003) (citing § 284 and *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1406 (Fed.Cir.1990), which states, "In patent law, the fact of infringement establishes the fact of damage because the patentee's right to exclude has been violated."). It is clear, therefore, that a finding of infringement is a prerequisite to damages under § 284.

#### c. Analysis

 The court's rulings, in Section IV. B., on "liability" issues, demonstrate that all of the bars to finding Ottawa liable for patent infringement have been removed. What remains, however, is a finding of infringement. Ottawa concedes that it resold bags of Pioneer ® brand seed corn between 1992 and 1998, and that it was without any license to do so. This court has also found that, as a matter of law, the "limited label license" prohibited reselling by Ottawa and that the "limited label license" is enforceable. Therefore, as a matter of law, Ottawa infringed Pioneer's patent rights by reselling Pioneer ® brand seed corn in violation of the terms of the "limited label license." Consequently, there are at least genuine issues of material fact as to whether or not Pioneer is entitled to damages for Ottawa's infringement under § 284. This portion of Ottawa's motion for summary judgment will be denied.

#### 3. Full compensation from prior sale

As its penultimate "damages" issue, Ottawa contends that, as a matter of law, Pioneer has already recovered its full profits in connection with the first sale of any seed, so that it is not entitled to any compensatory damages for Ottawa's allegedly wrongful conduct. Pioneer, however, disputes this contention, arguing that there are genuine issues of material fact as to whether or not it has been fully compensated for the value of its patent rights.

#### a. Arguments of the parties

Ottawa contends that Pioneer cannot show that it suffered any loss for which it is entitled to compensatory damages. Ottawa contends that Pioneer's calculation of damages based on an average profit of $30 per bag, or a total in lost profits of $121,830 for 4,061 bags sold by Ottawa, is flawed, because the bags *did* yield the actual profit that Pioneer found acceptable *when it sold them to Ottawa* or sold them to a dealer who sold them to Ottawa. Ottawa also argues that Pioneer's contention that Ottawa's sales took profits away from Pioneer is flawed, because it is based on the faulty assumption that Pioneer would have sold the seed to Ottawa *as well as* to Ottawa's customers, when there are in fact a finite number of end users, so that Ottawa's sales did not in fact deprive Pioneer of any customers. Therefore, Ottawa contends that Pioneer cannot show that it realized any less profit because of Ottawa's activities.

Pioneer, however, contends that it is Ottawa that is mistaken about the basis for damages in this case. First, Pioneer points out that 35 U.S.C. § 284 states, in mandatory terms, that upon a finding of infringement, the court *shall* award the

claimant damages adequate to compensate for the infringement, but in no event less than a "reasonable royalty." Pioneer also contends that Ottawa's "no lost profits" argument is again based on the faulty premise that the "first sale" rule applies in this case. However, Pioneer points out that what it made on sales to Ottawa was a profit on a conditional sale, that is, a sale to an end user to produce forage or grain, but Ottawa paid nothing for other patent rights, such as the right to resell the seed. In other words, Pioneer contends that any prior sale compensated it only for the value of the rights conveyed, the rights to use the seed corn to produce grain or forage, not the rights to resell the seed corn or any of the other patent rights that Pioneer "reserved" with its "limited label license." Thus, Pioneer argues, it is entitled to damages for unauthorized reselling under 35 U.S.C. § 284.

### b. Applicable law

Again, § 284 makes the award of damages mandatory upon a finding of infringement, and further states that the damages shall "in no event [be] less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284; *Dow Chem. Co.*, 341 F.3d at 1381 ("The statute is unequivocal that the district court must award damages in an amount no less than a reasonable royalty" upon a finding of infringement). The Federal Circuit Court of Appeals has also noted that further terms of § 284 make it "clear that expert testimony is not necessary to the award of damages, but rather '*may* [be] receive[d] … as an aid.'" *Dow Chem. Co.*, 341 F.3d at 1382 (quoting 35 U.S.C. § 284, with emphasis added by the *Dow* court). A "reasonable royalty" is determined according to the so-called "*Georgia–Pacific* factors." *Id.* (citing *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.

1970)). Similarly, the Federal Circuit Court of Appeals has explained that, where something less than all of the rights in the patent have been "sold" to a buyer, "[t]he price paid by the purchaser 'reflects only the value of the "use" rights conferred by the patentee.'" *Monsanto Co.*, 302 F.3d at 1299 (quoting *B. Braun Medical, Inc.*, 124 F.3d at 1426), and the "first sale" or "patent exhaustion" rule does not apply. *Id.; B. Braun Med., Inc.*, 124 F.3d at 1426 ("This exhaustion doctrine, however, does not apply to an expressly conditional sale or license.").

### c. Analysis

To the extent that this "no damages" argument by Ottawa is a "repackaging" of its "first sale" or "patent exhaustion" argument, that argument fails as a matter of law. Prior sales to Ottawa do not fully compensate Pioneer, because those *conditional* sales " reflect[ed] only the value of the 'use' rights conferred by the patentee," here, the rights to use the seed corn to produce grain or forage. *Monsanto Co.*, 302 F.3d at 1299) (quoting *B. Braun Medical, Inc.*, 124 F.3d at 1426). Pursuant to § 284, Pioneer is now entitled to recover at least a reasonable royalty for the infringement of the rights that it did *not* convey to Ottawa. 35 U.S.C. § 284; *Dow Chem. Co.*, 341 F.3d at 1382. Therefore, this portion of Ottawa's motion for summary judgment on "no damages" will be denied. Because Ottawa put at issue in its motion for summary judgment only whether Pioneer was entitled to damages under § 284, in light of Ottawa's "full compensation" argument, the parties have not yet litigated the amount of any "reasonable royalty."

### 4. Increased damages for "willful" infringement

Finally, Ottawa contends that it is entitled to summary judgment on any prayer

Pioneer may make for increased damages for "willful" infringement pursuant to 35 U.S.C. § 284. Pioneer contends that there are at least genuine issues of material fact to be resolved by a jury on whether or not Ottawa's conduct constituted "willful" infringement.

### a. Arguments of the parties

Even assuming that Pioneer can prove infringement, which Ottawa disputes, Ottawa contends that Pioneer cannot generate a genuine issue of material fact that Ottawa's conduct constituted "willful" infringement. This is so, Ottawa contends, because Pioneer cannot satisfy the applicable burden to show by clear and convincing evidence either that Ottawa was aware of Pioneer's patents or that Ottawa lacked a reasonable basis for a good faith belief that its conduct in reselling Pioneer® brand seed corn did not infringe Pioneer's patent rights. First, Ottawa reiterates its contention that there is no evidence that it ever resold bags marked with patent numbers, or that Pioneer asserted that it sold the bags of seed corn subject to a restriction on resale, so that Ottawa had no idea Pioneer was asserting patent infringement until this suit was filed against it. Ottawa also contends that its remedial action in desisting from further sales once Pioneer filed suit cuts against any finding that its conduct was "willful."

Pioneer, however, contends that there is ample evidence of Ottawa's "willfulness" to generate a jury question on the issue. First, Pioneer points to its May 1994 letter advising Ottawa that it was improper for Pioneer's Sales Representatives or dealers to sell Pioneer® brand seed corn to resellers such as Ottawa, which, at a minimum, suggested to Ottawa that its conduct was improper. Ottawa's characterization of that letter as a complaint about the conduct of Pioneer's own sales force is undercut, Pioneer contends, by Ottawa's representations that it contacted the FTC and the Illinois Attorney General's Office after receiving the letter purportedly to attempt to verify that reselling the seed corn was legal. However, Pioneer contends that those contacts with the FTC and the Illinois Attorney General's Office do not establish Ottawa's "good faith," because Ottawa made no attempt to determine the qualifications of the persons contacted at each body to offer an opinion, received no written opinion from either body, and Ottawa's inquiries failed to include the key information that the seed corn bag labels and bag tags included restrictions on use and resale. Moreover, Pioneer contends that there is evidence that Ottawa continued to resell Pioneer® brand seed corn for about two years after the bags of corn were "marked" with patent numbers. Pioneer also points to the deposition testimony of Lester Borden, Ottawa's former controller, that Ottawa's president and primary seed sales personnel simply didn't care that Pioneer objected to Ottawa's reselling activity. Pioneer also points to evidence that Ottawa engaged in various kinds of trickery, chicanery, and subterfuge to obtain Pioneer® brand seed corn, such as covering up the markings on its trucks when it picked up Pioneer® brand seed corn as well as other conduct designed to hide its identity as the buyer of the seed, so that it would not be recognized as a reseller of seed rather than a corn producer. Pioneer points out that Ottawa did not even attempt to obtain an opinion of counsel about the propriety of its conduct until *after* Pioneer instituted this litigation against Ottawa.

In its reply, Ottawa contends that, because there was no proper notice of potential patent infringement until this lawsuit was commenced, nothing that happened prior to the filing of the lawsuit is relevant to the "willfulness" inquiry. Ottawa points

**1056**

out that it ceased purchasing or reselling Pioneer ® brand seed corn once this lawsuit was filed against it.

### b. Applicable law

■ Section 284 also provides that, in the event either the jury or the court finds damages, "the court may increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The Federal Circuit Court of Appeals has explained that determination of whether or not the court should award "increased" damages pursuant to this portion of § 284 involves a two-step process:

Enhancement of damages under 35 U.S.C. § 284 involves the fact-finder determining that the infringer engaged in culpable conduct and the court exercising its discretion to determine whether and to what extent to enhance the damages. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570, 38 USPQ2d 1397, 1399 (Fed. Cir.1996). The jury's finding of willfulness satisfies the first step, *see id.*, and is also one of the factors the court assesses in performing the second step, *see Read [Corp. v. Portec, Inc.],* 970 F.2d [816,] 827, 23 USPQ2d [1426,] 1435 [ (Fed.Cir.1992) ]. However, there are other factors relevant to the second step. *See id.* (listing as factors: (1) deliberate copying; (2) infringer's investigation and good-faith belief of invalidity or non-infringement; (3) litigation conduct; (4) infringer's size and financial condition; (5) closeness of the case; (6) duration of the misconduct; (7) remedial action by the infringer; (8) infringer's motivation for harm; and (9) concealment). A finding of willful infringement "authorizes but does not mandate an award or increased damages." *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543, 16 USPQ2d 1622, 1625 (Fed. Cir.1990).

*Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1377–78 (Fed.Cir. 2002); *accord Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1314 (Fed. Cir.2002) ("A finding of willfulness does not mandate enhanced damages. Rather, [t]he paramount determination [for enhanced damages] ... is the egregiousness of the defendant's conduct based on all the facts and circumstances.") (internal citations and quotation marks omitted). "When it is found that the infringer acted without a reasonable belief that its actions would avoid infringement, the patentee has established willful infringement, which may be accompanied by enhanced damages." *Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1378 (Fed.Cir.2002) (citing *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1346, 57 USPQ2d 1953, 1957 (Fed.Cir.2001)). "Willfulness" is a question of fact that must be proved by clear and convincing evidence. *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1363 (Fed.Cir.1998). The language of the statute providing for an increase in damages "up to three times the amount found or assessed," *see* 35 U.S.C. § 284, the Federal Circuit Court of Appeals has explained, "simply recognize[s] the upper range of the possible enhancement," but does not limit the court to a "trebling" of the basic damage award. *Transclean Corp.*, 290 F.3d at 1378. The district court's determination of whether or not to award "increased" damages is reviewed for abuse of discretion. *Id.*

### c. Analysis

■ To keep the issue of "increased" damages in play, Pioneer must "demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Eli Lilly & Co.*, 251 F.3d at 971. The court is satisfied that Pioneer has met this burden.

As to the first step in the "increased damages" analysis under § 284, the fact-finder's determination of whether or not the infringer engaged in culpable conduct, *see Transclean Corp.*, 290 F.3d at 1377, Pioneer has generated genuine issues of material fact that Ottawa's infringement was "willful" by pointing to evidence that its May 1994 letter advising Ottawa that it was improper for Pioneer's Sales Representatives or dealers to sell Pioneer ® brand seed corn to resellers such as Ottawa, at a minimum, suggested to Ottawa that its conduct was improper; evidence that Ottawa continued to resell Pioneer ® brand seed corn for about two years after the bags of corn were "marked" with patent numbers; deposition testimony of Lester Borden, Ottawa's former controller, that Ottawa's president and primary seed sales personnel simply didn't care that Pioneer objected to Ottawa's reselling activity; and evidence that Ottawa engaged in various kinds of trickery, chicanery, and subterfuge to obtain Pioneer ® brand seed corn, such as covering up the markings on its trucks when it picked up Pioneer ® brand seed corn and other conduct designed to hide its identity as the buyer of the seed, so that it would not be recognized as a reseller of seed rather than a corn producer. Moreover, Pioneer has pointed to evidence that Ottawa acted without a reasonable belief that its actions would avoid infringement, *see Vulcan Eng'g Co.*, 278 F.3d at 1378, notwithstanding Ottawa's supposed reliance on opinions from the FTC and the Illinois Attorney General's Office that Ottawa could properly sell Pioneer ® brand seed corn. As Pioneer contends, Ottawa made no attempt to determine the qualifications of the persons contacted at each body to offer an opinion, received no written opinion from either body, and Ottawa's inquiries failed to divulge the key information that the seed corn bag labels and bag tags included restrictions on use and resale.

Similarly, as to the second step in the analysis, whether the court, exercising its discretion, should increase damages and to what extent, Pioneer's evidence implicates several of the nine pertinent factors. *See Transclean Corp.*, 290 F.3d at 1377–78. At a minimum, Pioneer has produced evidence that Ottawa's "investigation and good-faith belief of non-infringement" were seriously flawed; that Ottawa continued to resell Pioneer ® brand seed corn for years after it had adequate knowledge, from the unambiguous terms of the bag labels and bag tags, and the May 1994 letter, that such conduct was forbidden by Pioneer (duration of misconduct); that Ottawa took no "remedial action" until 1998, when it was sued for infringement; and that Ottawa "concealed" its identity as the buyer of Pioneer ® brand seed corn. *Id.* at 1378 (identifying nine factors pertinent to the court's determination of whether or not to enhance damages). Moreover, the genuine issues of material fact on Ottawa's "willfulness" also generate genuine issues of material fact on the second step of the inquiry. *See id.* at 1377 ("The jury's finding of willfulness ... is also one of the factors the court assesses in performing the second step.").

Thus, Ottawa is not entitled to summary judgment on Pioneer's prayer for "increased" damages pursuant to § 284.

## V. CONCLUSION

For the reasons explained more fully above, Ottawa's July 22, 2003, Motions For Summary Judgment Of Noninfringement And No Damages (docket no. 174) and Pioneer's July 22, 2003, Motion For Partial Summary Judgment Re: Infringement And Enforceability Of Pioneer's Limited Label License And Re: Ottawa's Affirmative Defense Under The Doctrine Of Pat-

ent Exhaustion (docket no. 175) are granted or denied, as follows:

1. Ottawa's motion for summary judgment is **denied** and Pioneer's motion for partial summary judgment is **granted** as to whether Ottawa's purchase and resale of Pioneer ® brand seed corn is immunized from liability for patent infringement under the "first sale" or "patent exhaustion" doctrine. The "first sale" or "patent exhaustion" doctrine is inapplicable as a matter of law.

2. Ottawa's motion for summary judgment is **denied** and Pioneer's motion for partial summary judgment is **granted** as to whether Ottawa had notice of and was bound by Pioneer's restrictions in its "limited label license." As a matter of law, Ottawa had notice of and was bound by Pioneer's restrictions in its "limited label license."

3. Ottawa's motion for summary judgment is **denied** and Pioneer's motion for partial summary judgment is **granted** as to whether Pioneer's "limited label license" restrictions are enforceable or are instead unenforceable as against public policy owing to their anticompetitive effect or unenforceable under applicable contract principles. The restrictions are enforceable as a matter of law.

4. Ottawa's motion for summary judgment is **denied in part and granted in part** as to whether Ottawa had notice of the patents-in-suit and alleged infringement supporting Pioneer's claim for compensatory damages under 35 U.S.C. § 287. The motion is **denied** as to a prayer for damages for the 1996, 1997, and 1998 sales seasons, but granted as to sales seasons prior to 1996.

5. Ottawa's motion for summary judgment is **denied** as to whether any of the seed tags or seed bags purchased and resold by Ottawa contained any language

prohibiting resale supporting Pioneer's claim for damages under 35 U.S.C. § 284.

6. Ottawa's motion for summary judgment is **denied** as to whether Pioneer has already recovered its full profits in connection with the first sale of any seed, so that Pioneer is not entitled to any compensatory damages.

7. Ottawa's motion for summary judgment is denied as to Pioneer's prayer for "increased" damages pursuant to 35 U.S.C. § 284.

**Further,** Ottawa's August 12, 2003, Motion To Strike Certain Paragraphs Of Bruce Hall's Affidavit (docket no. 187) is **denied as moot** in light of the court's disposition of the cross-motions for summary judgment.

**IT IS SO ORDERED.**